UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

DAVID DUGGAN, BOB JAROSCH, JOHN VANYO,
TOM DONNELLY, and DONNELLY INSURANCE
AGENCY, INC., and GARY SWANIGAN,

        Plaintiffs,

        v.                             Case No. 07-C-212

AMERICAN FAMILY MUTUAL INSURANCE
COMPANY, AMERICAN FAMILY LIFE INSURANCE
COMPANY, and AMERICAN STANDARD INSURANCE
COMPANY OF WISCONSIN,

        Defendant-Third Party Plaintiffs,

        v.

JAROSCH INSURANCE AGENCY, INC., VANYO
INSURANCE GROUP, INC., DONNELLY INSURANCE
GROUP, INC., GARY SWANIGAN INSURANCE
AGENCY, INC., COURI INSURANCE ASSOCIATES, LLC,
and COURI INSURANCE ASSOCIATES WEST, LLC.,

        Third-Party Defendants.

## DECISION AND ORDER ON CROSS-MOTIONS
## FOR SUMMARY JUDGMENT

      This action was removed from the Waukesha County Circuit Court to this court on March 5,

2007. At issue in the action is a series of claims and counter-claims stemming from the contractual

arrangements among the parties with respect to the selling of insurance policies. More specifically,

the plaintiffs (collectively referred to as "Agents") are insurance agents who terminated their

relationship with the defendant-third party plaintiffs (collectively referred to as "American Family")

in order to establish new insurance agencies with the third-party defendants (collectively referred to

as "Insurance Agencies"). Following the Agents' exit from American Family, American Family

notified the Agents that they would not be receiving certain commissions due to them because their

new relationship with the Insurance Agencies was in violation of the Agents' contracts (hereinafter

referred to as "Agent Agreements") with American Family. American Family further contends that the Agents and the Insurance Agencies misappropriated American Family's trade secrets, to wit, the contents of American Family's database information (hereinafter "ADS System").

On June 16, 2009, the Agents and the Insurance Agencies filed a partial motion for summary judgment based upon the following: (1) the covenants not to compete agreed upon by the Agents are void and unenforceable because they fail to meet the minimum requirements of Wis. Stat. § 103.465 (2006-07)[1]; (2) the forfeiture clause contained in the Agent Agreements is unreasonable and violates the public policy of the State of Wisconsin; (3) the Agents and the Insurance Agencies did not misappropriate American Family's trade secrets in contravention of Wis. Stat. § 134.90.

On August 17, 2009, American Family filed its own partial motion for summary judgment. In the motion, American Family seeks summary judgment on its trade secrets claim based upon its assertion that the Agents and the Insurance Agencies misappropriated the information in American Family's ADS System.

The parties' motions are now fully briefed and are ready for resolution. For the reasons that follow, the Agents and Insurance Agencies' motion for partial summary judgment will be denied and American Family's motion for partial summary judgment will be granted in part and denied in part.

## I. FACTUAL BACKGROUND

The Agents, many of whom had worked for American Family for fifteen years or more, terminated their Agent Agreements with American Family in 2006. More specifically, the Agents terminated their relationships with American Family as follows: (1) Donnelly on June 5, 2006; (2) Jarosch on September 11, 2006; (3) Vanyo on October 9, 2006; (4) Swanigan on February 28, 2006; and (5) Duggan on April 30, 2006. The Agents had not worked in the insurance business before

---

[1] All references to the Wisconsin Statutes are to the 2006-07 version unless otherwise noted.

joining American Family and American Family trained them and helped them underwrite their agencies. A significant reason why the Agents decided to terminate their relationship with American Family was that they believed American Family's premium rates in Arizona were no longer competitive. (Plaintiffs' Statement of Facts ("PSOF") ¶ 18.)  Consequently, as much as 10% of the Agents' policyholders were terminating their relationship with American Family on an annual basis. (*Id*.)  Sometime after the termination of the Agent Agreements, American Family notified the Agents that the company was discontinuing the payment of extended earnings to the Agents, in part because American Family believed the Agents had violated the covenant not compete contained in the Agent Agreements.  (PSOF ¶¶ 44-48.)

Several months before they terminated their Agent Agreements with American Family, the Agents began meeting with representatives from Couri Insurance,[2] an American Family competitor and a named third-party defendant in this action.  (Defendants' Proposed Findings of Fact ("DPFOF") ¶ 12.)  After meeting with Couri personnel on numerous occasions, the Agents (with the exception of Duggan) signed corporate documents with Couri establishing their intent to form new insurance agencies whereby Couri would be a 50% shareholder in each agency with the named agent as the other 50% shareholder.  (DPFOF ¶ 13.)  The Agents executed the corporate documents with Couri months before they left American Family.  (DPFOF ¶ 15.)

Each of the Agents was required to take—and took—courses offered by American Family concerning the confidentiality of customer records.  (DPFOF ¶ 103.)  At those instructional courses, the Agents were advised of American Family's confidentiality policy contained in its code of conduct and business ethics.  (DPFOF ¶ 104.)  Additionally, the Agent Agreements contained, among other

---

[2]Couri Insurance Associates, LLC and Couri Insurance Associates West, LLC, both of which are limited liability companies organized and operating under Chapter 187, Wis. Stats. (PSOF ¶¶ 15, 16),  are collectively referred to as Couri for purposes of this decision and order.

3

things, covenants not to compete as well as forfeiture clauses. Moreover, the Agent Agreements provided that, upon termination, each agent must return to American Family all policies, policy records, materials or other property in the agent's possession. (DPFOF ¶ 102.)

Donnelly, Jarosch, Vanyo, and Swanigan separately incorporated new insurance agencies in Arizona following the termination of their Agent Agreements with American Family. (PSOF ¶¶ 1, 3, 4, 10, 14, 37, 39.) The Agents also served as officers in each of the new corporations. The newly formed insurance agencies were incorporated respectively as Donnelly Insurance Agency, Inc., Jarosch Insurance Agency, Inc., Vanyo Insurance Group, Inc., and Gary Swanigan Insurance Agency, Inc.—all of which are named as third-party defendants in this action. As noted above, at all times relevant to this action, Couri and the Agent associated with each of the newly-incorporated insurance agencies owned one-half shares in the agencies. (PSOF ¶ 16.)

Duggan met with representatives from Couri months before he terminated his Agent Agreement with American Family. (DPFOF ¶ 120.) On March 23, 2006, Duggan completed and signed a Couri Associates LLC Agent Application. (DPFOF ¶ 122.) In the months surrounding the termination of his Agent Agreement, Duggan decided not to establish his own corporation with Couri, but to join Donnelly Insurance Group as a producer. (DPFOF ¶ 121.) Accordingly, on June 5, 2006, Duggan joined Donnelly's newly-formed insurance agency as managing agent. (PSOF ¶ 41, DPFOF ¶ 117.) For each policy that Duggan sells while he is a producer for Donnelly Insurance Group, Couri receives 10% of the commission on that policy, Donnelly Insurance Group receives 45% and Duggan receives 45%. (DPFOF ¶ 123.)

**American Family's ADS System**

Applications for insurance coverage and changes to existing insurance coverage were submitted by the Agents into American Family's ADS System (PSOF ¶ 19.) American Family's

4

ADS System records policyholder information concerning, among other things, the policyholder's name, address, date of birth, all various telephone numbers, email addresses, VIN numbers, all policy types, premium information on all policies, effective and expiration dates on all policies, out-of-force dates, whether each policy is active or inactive, years since major and minor traffic violations, demerit point ranges for given policies, claim history for certain policies, prospect information, history of contacts with policyholders and relationship information. (DPFOF ¶ 1.) The ADS System is American Family's proprietary software that is provided to each agent so that the agent can store his or her policyholder information electronically in a common format. (DPFOF ¶ 2.)

Each Agent used the ADS System to store information about his American Family policyholders. (DPFOF ¶ 3.) American Family maintains its policyholder database for the exclusive use of its agents in order to facilitate the service and sale of insurance to customers or potential customers. (DPFOF ¶ 4.) The database contains confidential information regarding active, inactive and prospective clients for American Family. (DPFOF ¶ 5.) The names entered into the database are selectively chosen and screened based on an assessment of the person's suitability to buying insurance. (DPFOF ¶ 6.) Only the names of people who are likely to buy insurance or who have already purchased insurance from American Family are entered into the database. (DPFOF ¶ 7.) This database is an important tool for American Family agents and American Family allows only its agents and information technology staff to access the database on a restricted basis. (DPFOF ¶ 8.) The database is highly secure and American Family has spent millions of dollars to roll-out, support, establish and maintain the ADS System. (DPFOF ¶ 9.) American Family has never sold any of its policyholder information to the Agents (or any other agents). (DPFOF ¶ 10.) American Family does not keep its policyholder information in a publicly accessible forum. (DPFOF ¶ 11.)

5

While operating their American Family insurance agencies, Donnelly, Jarosch, Vanyo, Swanigan and Duggan recorded policyholder information on file folders that were purchased from American Family.[3] (PSOF ¶¶ 22-26.) Policyholder names, addresses and other policyholder information were oftentimes available to the Agents by reviewing the policyholder information kept in the file folders. (PSOF ¶ 49.)

Prior to the termination of the Agent Agreements, American Family provided the Agents with monthly commission statements. (PSOF ¶ 50.) The monthly commission statements identified the names of the Agent's policyholders, all new and renewal business written by each Agent during the preceding month, and information relating to the type of insurance coverage written, the amount of the premium charged for the coverage, the term of the insurance policy, the approximate renewal or expiration date, and the commissions that were to be paid as a result of business written. (PSOF ¶ 51.) The Agents retained these monthly commission statements as a part of their business records and used the statements to prepare and file federal and state income tax returns and for other business purposes. (PSOF ¶ 52.)

Following termination of the Agent Agreements between the Agents and American Family, American Family continued to send the Agents monthly commission statements with respect to life insurance policies that the Agents had written and that remained in effect. The monthly commission statements were prepared by American Family using a database other than the ADS System and the

---

[3] American Family and the Agents dispute whether the Agents completely recorded each policyholder's information in the file folders. While the Agents claim that the vast majority of file folders were completely filled out, American Family has submitted specific examples of file folders that were not filled out and that could not have supplied the information about the policyholders that the Agents submitted into the Fiserv Database. (Defs.' Reply Br. Supp. Summ. J. at 12.) American Family further asserts that these examples are a sample of "hundreds of file folders . . . [that] are representative of each plaintiff's practice and demonstrate[ ] that they could not and did not take all of the customer information from what was recorded on the file folders." (*Id.* at 12-13, fn. 5.)

Agents had no access to the database used by American Family to prepare and distribute these monthly commission statements.  (PSOF ¶ 56.)

In the last few months before leaving American Family, Donnelly, Swanigan, Jarosch and Vanyo began entering American Family policyholder information into an electronic database (hereinafter "Fiserv Database") for the benefit of the Agents' new insurance agencies.  (PSOF ¶ 54, DPFOF ¶ 17.)  The information entered into the Fiserv Database by the Agents contained information such as the names, addresses, telephone numbers and in some cases, policyholder information, social security numbers, driver's license numbers, vehicle identification numbers, premium information, types of policies held by the insured, coverage, policy limits, birthdates and the like.  (PSOF ¶ 54; DPFOF ¶ 18.)  Some of the information entered by Donnelly, Swanigan, Jarosch, and Vanyo into the Fiserv Database prior to the termination of the Agent Agreements was prepared using information that the Agents obtained from reviewing the file folders in which they maintained American Family policyholder information.  (PSOF ¶ 55.)

Except for Vanyo, who directly transferred prospect information from the ADS System into the Fiserv Database, each Agent asserts that he took the policyholder information from paper files in his American Family office and that he did not take the information electronically from the ADS System.  (DPFOF ¶ 22.)  However, the electronic access logs show that the Agents ran numerous queries in the ADS System before terminating their Agent Agreements.  (DPFOF ¶ 23.)

More specifically, the electronic-file access logs show that, in the months surrounding the Agents' exit from American Family, the Agents either downloaded or printed large lists of various policyholder information.  (DPFOF ¶ 24.)  Accessing the ADS System requires both an identification log-in name and a password; query logs identify whose log-in was used to download and print these reports.  (Id.)  The query logs show that the Agents ran queries for information such as all of the

Agents' American Family policyholders with homeowner insurance or all of the Agents' American Family policyholders with commercial policies. (DPFOF ¶ 25.)

So, for example, Jarosch ran an ADS System report on July 24, 2006, one day before finalizing his corporate paperwork with Couri and months after he first met with Couri. The logs show that Jarosch exported to Excel a report that included policyholder names, policy types, risk descriptions, policy effective dates, policy expiration dates, policy premium amounts, information concerning newly-created or modified policies, policy producer descriptions, originating agency for each policy, customer identifications, customer names, mail names, customer-greeting preferences, customer addresses, customer phone numbers, and customer email addresses. (DPFOF ¶ 26.) That same day (July 24, 2006), a USB device was attached to Jarosch's laptop that he purchased for his new insurance agency. (DPFOF ¶ 27.) The other Agents ran similar queries before they terminated their Agent Agreements with American Family. (DPFOF ¶ 28.)

At the time the Agents terminated their Agent Agreements with American Family, many of the policyholders credited to their accounts were family members or business and social acquaintances. (PSOF ¶¶ 27-31.) That said, the Agents concede that they received policies transferred to them throughout their careers at American Family. (DPFOF ¶ 30.) Indeed, American Family provided the Agents with Agent Operating Reports on an annual basis that identified the number of policies that were transferred to them from other agents. (DPFOF ¶ 31.) At the end of 2005, for example, the number of policies that American Family transferred to each agent was as follows: Jarosch 815 policies (plus 4 health); Swanigan 771 policies (plus 8 health); Duggan 658 policies (plus 7 health); Vanyo 658 policies (plus 12 health); and Donnelly 472 policies (plus 6 health). (DPFOF ¶ 32.)

Once the Agents and their Insurance Agencies had all of American Family's policyholder information entered into the Fiserv Databases, the Agents proceeded to start selling insurance policies for other companies. Specifically, the Agents, through the Insurance Agencies, sent letters to all of their former American Family policyholders telling the policyholders about their new corporations. (DPFOF ¶ 33.) In their letters, the Agents told the American Family policyholders that the new competitor corporations could provide better rates on insurance and better service to the policyholders. (DPFOF ¶ 34.) In some cases, the Agents either sent or dated the letters before informing American Family that they were resigning. (DPFOF ¶ 35.)

Jarosch and Vanyo estimate the number of their American Family policyholders at termination to be approximately 700 to 1,100 each. (DPFOF ¶ 36.) Swanigan and Donnelly did not know how many American Family policyholders they had as clients, but Swanigan agreed he had 2,100 in-force American Family policies at the time of termination and Donnelly agreed that he had 2,253 in-force American Family policies at the time of termination. (DPFOF ¶ 37.) Donnelly, Vanyo and Swanigan estimated that they each transferred between 30% to 60% of their American Family book-of-business to their new competitor corporations. (DPFOF ¶ 38.)

Jarosch, Duggan and Swanigan and Donnelly each understood that American Family expected its customer information to be treated as confidential. (DPFOF ¶ 95.) Jarosch and Duggan understood they were obligated by state and federal privacy laws to keep customers' personal, account and medical information private. (DPFOF ¶ 96.) Jarosch and Duggan understood that, pursuant to American Family policy, customer information was not to be accessed or used for personal purposes. (DPFOF ¶ 97.)

9

## II.  STANDARD OF REVIEW

A district court must grant summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e) advisory committee's note to 1963 amendment).  "Summary judgment is not appropriate 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  A party opposing a properly supported summary judgment motion "may not rely merely on allegations or denials in its own pleading; rather, its response must—by affidavits or as otherwise provided in this rule—set out specific facts showing a genuine issue for trial."  Fed. R. Civ. P. 56(e)(2); *see also Outlaw v. Newkirk*, 259 F.3d 833, 837 (7th Cir. 2001).  To state it differently, "[a] party will be successful in opposing summary judgment only when they present definite, competent evidence to rebut the motion."  *EEOC v. Sears, Roebuck & Co.*, 233 F.3d 432, 437 (7th Cir. 2000) (quoting *Smith v. Severn*, 129 F.3d 419, 427 (7th Cir. 1997)).

To determine whether a genuine issue of material fact exists, the court must review the record, construing all facts in the light most favorable to the nonmoving party and drawing all reasonable

inferences in that party's favor. *See Heft v. Moore*, 351 F.3d 278, 282 (7th Cir. 2003) (citing *Anderson*, 477 U.S. at 255). "'In the light most favorable' simply means that summary judgment is not appropriate if the court must make 'a choice of inferences.'" *Draghi v. County of Cook*, 184 F.3d 689, 691 (7th Cir. 1999) (quoting *Smith*, 129 F.3d at 425). "The evidence must create more than 'some metaphysical doubt as to the material facts.'" *Albiero v. City of Kankakee*, 246 F.3d 927, 932 (7th Cir. 2001) (quoting *Johnson v. Univ. of Wis.-Eau Claire*, 70 F.3d 469, 477 (7th Cir. 1995)). "A mere scintilla of evidence in support of the nonmovant's position is insufficient." *Id.* (citing *Anderson*, 477 U.S. at 252).

Thus, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

## III. ANALYSIS

### A. Enforceability of Covenant Not to Compete

The plaintiffs contend that the covenant not to compete contained in Paragraph 6.k. of the Agent Agreements is void and unenforceable because it violates the requirements of Wis. Stat. § 103.465.[4] In particular, the Agents argue as follows: (1) "[t]he covenant not to compete

---

[4]This action is before the court based on this court's diversity jurisdiction. Accordingly, some review of the applicable statutory law is necessary. As American Family notes in its brief in response to the plaintiffs and third-party defendants' summary judgment motion, "[a] district court sitting in diversity applies the choice of law principles of the state in which it sits in order to determine which state's substantive law applies." (Defs.' Br. Opp. Summ. J. at 16-17 (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941).) American Family correctly continues by stating that "Wisconsin law applies to the interpretation of § 6.k. in light of the Wisconsin forum selection clause in the agreement (§ 7.d.) and choice-of-law principles." (*Id.* at 17 (citing *Beilfuss v. Huffy Corp.*, 2004 WI App 118, ¶ 17, 274 Wis. 2d 500, 685 N.W.2d 373).)

As for American Family's trade secrets claim, American Family states that "because both Wisconsin and Arizona have adopted the Uniform Trade Secrets Act . . . American Family applies Wisconsin law . . . ." (*Id.* (citing *Cerabio LLC v. Wright Med. Tech.*, 410 F.3d 981, 987 (7th Cir. 2005)("[U]nder Wisconsin's choice of law algorithm, if the laws of the competing states are the same, a court must apply Wisconsin law . . . .").) I have reviewed the case law on this issue and I find myself in agreement with American Family. Accordingly, the court will apply Wisconsin law in addressing the Agent Agreements as well as the trade secrets claim.

11

does not contain a reasonable geographic restriction; and (2) [t]he covenant not to compete is not reasonably necessary for the protection of American Family." (Pls.'Br. at 7.)

The covenant not to compete at issue in the Agent Agreements provides as follows:

> For a period of one year following termination of this agreement, you will not either personally or through any other person, agency, company or organization directly or indirectly induce, attempt to induce or assist anyone else in inducing or attempting to induce any policyholder of the Companies credited to your account at the time of termination to lapse, cancel, replace or surrender any insurance policy in force with the Companies. In the event the "period of one year" conflicts with any statutory provisions, such period shall be the period permitted by statute.

(PSOF ¶ 17.)

Covenants not to compete, such as the ones at issue in the Agent Agreements, are enforceable in the State of Wisconsin only if they comply with the requirements of Wis. Stat. § 103.465. That statute provides as follows:

> **103.465 Restrictive covenants in employment contracts.** A covenant by an assistant, servant or agent not to compete with his or her employer or principal during the term of the employment or agency, or after the termination of that employment or agency, within a specified territory and during a specified time is lawful and enforceable only if the restrictions imposed are reasonably necessary for the protection of the employer or principal. Any covenant, described in this subsection, imposing an unreasonable restraint is illegal, void and unenforceable even as to any part of the covenant or performance that would be a reasonable restraint.

This statute expresses a strong public policy against the enforcement of unreasonable trade restraints on employees. *Tatge v. Chambers & Owen, Inc.*, 219 Wis. 2d 99, 114-15, 579 N.W.2d 217 (1998). In order to be enforceable, a contract provision governed by the statute must: "(1) be necessary to protect the employer; (2) provide a reasonable time limit; (3) provide a reasonable territorial limit; (4) not be harsh or oppressive to the employee; and (5) not be contrary to public policy." *Heyde Cos., Inc. v. Dove Healthcare, LLC*, 2002 WI 131, ¶16, 258 Wis. 2d 28, 654 N.W.2d 830 (citations omitted). Additionally, courts are to apply the following rules of construction when determining the enforceability of a covenant not to compete: (1) a covenant not to compete is prima facie suspect; (2)

a covenant must withstand close scrutiny to pass legal muster as being reasonable; (3) a covenant will not be construed to extend beyond its proper import or further than the language of the contract absolutely requires; and (4) a covenant is to be construed in favor of the employee. *Id.*

At the outset, the Agents are challenging two aspects of the covenant, specifically: (1) the covenant presents an unreasonable territorial restriction; and (2) the covenant is not reasonably necessary for the protection of American Family. Notably, the Agents do not appear to argue that the covenant not to compete otherwise fails to meet the requirements of Wis. Stat. § 103.465. As a result, the court will assume that the covenant not to compete at issue in the Agent Agreements otherwise meets the requirements of Wis. Stat. § 103.465.

The parties agree that a customer-list limitation is considered a territorial limitation for purposes of Wis. Stat. § 103.465. (Pls.'Br. Opp. Summ. J. at 10-11; Defs.' Br. Opp. Summ. J. at 9.) This is in keeping with the Wisconsin Supreme Court's opinion in *Chuck Wagon Catering, Inc. v. Raduege*, wherein the court held that a permissible territorial limitation is one that is "limited to the route or customers [the employee] actually services." 88 Wis. 2d 740, 754, 277 N.W.2d 787 (1979). *See also Farm Credit Services v. Wysocki*, 2001 WI 51, ¶ 13, 243 Wis. 2d 305, 627 N.W.2d 444 ("[T]he term 'specified territory' in § 103.465 encompasses customer lists as well as geographical restrictions . . . .").

Courts have stated with respect to customer-list limitations that, "[i]n accordance with the policy of encouraging the freedom of movement of employees and protecting their personal liberty, such fluid limitations should be given greater breadth than rigid geographical restrictions because they oftentimes 'more closely approximate the area of the employer's vulnerability to unfair competition by a former employee and do not deprive the employee of legitimate competitive opportunities to

13

which he is entitled." *Wysocki*, 2001 WI 51, ¶ 15 (quoting *Hunter of Wisconsin, Inc. v. Hamilton*, 101 Wis. 2d 460, 304 N.W.2d 752 (1981)).

In this instance, the parties dispute whether the territorial restriction included in the covenants not to compete was a reasonable restriction. A covenant not to compete is void if any provision in the covenant "unreasonably inhibited [the plaintiff's] ability to pursue a livelihood in his field." *Wysocki*, 2001 WI 51, ¶ 16; *see also Hillis v. Waukesha Title Co., Inc.*, 576 F. Supp. 1103, 1106 (E.D. Wis. 1983) ("[A] restrictive covenant is enforceable if it is found to be reasonable in the particular circumstances of its operation"); *Fields Foundation, Ltd. v. Christensen*, 103 Wis. 2d 465, 471, 309 N.W.2d 125 (Ct. App. 1981) (stating that courts are to assess reasonableness by considering totality of the circumstances and that facts are "critical" to the assessment). The Wisconsin Supreme Court has "required that the restriction from competition not be unreasonable as to the employee or the general public." *Chuck Wagon*, 88 Wis. 2d at 754. Both sides to this argument have come armed with a series of (sometimes overlapping) cases that purport to show the reasonableness or unreasonableness of the particular restriction at issue here.

The Agents argue that the language at issue prohibits "any conduct which would induce the policyholder to lapse, cancel, replace or surrender any insurance coverage which the policyholder has with American Family, even though the policyholder obtains replacement insurance coverage from an agent other than the former American Family agent." (Pls.'Br. at 12-13.) Stated another way, the Agents argue that the language in the covenant prohibiting the agents from directly or indirectly inducing a variety of activities prohibits such a broad range of conduct that the restriction is unreasonable. So, for example, the Agents contend that "[t]he covenant not to compete contained in Paragraph 6.k. prohibits the agent from discussing the reasons the agent terminated his relationship

with American Family because such statements might indirectly induce a policyholder of American Family to obtain insurance quotations from another insurance company." (Pls.'Br. at 13.)

In my opinion, the real issue here is whether the covenant's restriction on any activities that would directly or indirectly induce a range of behaviors on the part of certain American Family policyholders is per se unreasonable. The Wisconsin Supreme Court has stated that courts construing covenants not to compete are to "interpret them reasonably so as to avoid absurd results, giving the words their plain meaning, reading as a whole, and giving effect where possible to every provision." *Star Direct Inc. v. Dal Pra*, 2009 WI 76, ¶ 62, 319 Wis. 2d 274, 304, 767 N.W.2d 898. Turning to the language of the customer-list limitation in this case, the dictionary defines "induce" as "to lead or move by influence or persuasion," "to bring about the occurrence of; cause." American Heritage Dictionary 657 (2d College Edition 1982). Simply put, I believe it was not per se unreasonable for American Family to insert language into the covenants prohibiting the Agents from using their persuasion or influence to cause certain American Family policyholders to cancel or terminate their in-force policies with American Family. Rather, I believe it is necessary to examine the totality of the circumstances surrounding the restriction to determine whether it unreasonably interfered with the Agents' ability to earn a livelihood in their chosen profession.

As for the Agents' resort to the Wisconsin Supreme Court's decisions in *Chuck Wagon* and *Wysocki*, I am not persuaded that my finding is inconsistent with the holdings in those cases. In both of the decisions referenced by the Agents, the Wisconsin Supreme Court emphasized the fact-specific inquiry courts are to engage in before determining the reasonableness of a particular covenant not to compete. *Chuck Wagon*, 88 Wis. 2d at 752; Wysocki, 2001 WI 51, ¶ 16. I do not read those decisions as setting forth the boundaries beyond which a customer-list limitation may not reasonably go. And

15

so, the court will turn to the particular facts of the Agent Agreements in this case to determine whether the customer-list limitation contained in the agreements was reasonable.

After reviewing the record in this case, I am satisfied that the defendants have demonstrated that the customer-list limitation contained in the covenants did not inhibit the Agents' ability to perform in their chosen profession. Notably absent from the record is any evidence that the covenant prevented the Agents from working as insurance agents in their new roles. To be sure, the Agents note that a number of the policyholders who contracted with the Agents were the Agents' friends and family members. (PSOF ¶¶ 27-31.) And, under the terms of the customer-list limitation, the Agents are correct that they were prohibited from taking any actions that would induce this group of policyholders to cancel (or replace, lapse or terminate) their in-force policies with American Family. That said, nothing in the Agent Agreements prohibited the Agents from offering additional insurance to any policyholders credited to their accounts with American Family at the time they left the company. Thus, the Agents were free to contact and even to a certain extent solicit any friends and family members who were otherwise covered by the customer-list limitation so long as the Agents did not take certain actions with respect to a potential client's in-force policy with American Family.

With respect to the Agents' hypothetical scenarios, the Agents have not offered any evidence into the record to support their contention that such scenarios presented any threat to their ability to perform as insurance salespersons in their new positions. Without such evidence, I have sparse grounds upon which to determine that the customer-list limitations unreasonably interfered with the Agents' ability to perform in their new roles. As a result, I find myself in agreement with American Family that the customer-list limitation did not unreasonably interfere with the Agents' ability to perform in their new positions.

16

Nor do I find the customer-list limitation in this case to be unreasonable as to the general public. As an initial matter, neither side has addressed the issue. But, in considering the impact of the customer-list limitation on the general public, I have little pause in finding that the customer-list limitation is reasonable. In *Chuck Wagon*, the court stated that "[t]he covenant would not be unreasonable as to the general public since it does not create a shortage of employees or of this type of service, kill competition or create a monopoly." 88 Wis. 2d at 755. The same could be said for the customer-list limitation in this case.

The Agents next argue that the covenant not to compete is void because it "is not limited to insurance policies assigned to the agent at the time the contract was terminated." (Pls.'Br. at 15.) The Agents continue by stating that a restriction identical to the one at issue before this court was found invalid in *Mutual Service Casualty Company v. Brass*, 2001 WI App 92, 242 Wis. 2d 733, 625 N.W.2d 648 *overruled on other grounds by Star Direct*, 319 Wis. 2d at 311. As a result, the Agents conclude that "[a] covenant not to compete which applies to 'any insurance policy in force with the companies', not just those policies assigned to the agent, cannot comply with the requirements of Wis. Stat. § 103.465, and is void."

All of that said, I find myself in agreement with American Family's characterization of the Wisconsin Court of Appeals' opinion in *Brass*. Specifically, in *Brass*, the court addressed the challenge to the customer-list limitation in pertinent part as follows:

> [The customer-list limitation] provide[s] that Brass must forfeit all termination compensation that remains unpaid if he solicits any [of the former employer's] policyholders. This indicates that Brass is to have nothing to do with [the former employer's] policyholders, known or unknown, in Wisconsin or anywhere else in the world. Thus [the customer-list limitation is] overly broad and fails under Wis. Stat. § 103.465.

2001 WI App 92, ¶ 13. In contrast to the above, the customer-list limitation in the Agent Agreements provides that an agent cannot induce "any policyholders of the Companies *credited to [the agent's]*

*account at the time of termination* to lapse, cancel, replace or surrender any insurance policy in force with the Company." (emphasis added). I am satisfied that this limitation, by limiting its scope to American Family policyholders credited to the Agents' accounts at the time of each Agents' termination, is materially different from the customer-list limitation rejected by the *Brass* court. Indeed, the customer-list limitation before the court appears to be substantially similar to the customer-list limitations approved by the Wisconsin Supreme Court in *Chuck Wagon*, 88 Wis. 2d at 754, and *Wysocki*, 2001 WI 51, ¶ 16.

The Agents also contend that the customer-list limitation currently before the court is not reasonably necessary for the protection of American Family. (Pls.'Br. at 17.) In support of this argument, the Agents contend that "[t]he covenant seeks to extend to American Family protections against normal and customary competition which American Family must reasonably expect or anticipate from all competitors." (*Id.*) And so, the Agents continue by identifying a number of ways by which an Agent might indirectly induce an American Family policyholder to cancel an in-force American Family policy. (*Id.* at 17-18.)

In my opinion, the covenant not to compete at issue in the Agent Agreements was reasonably necessary for the protection of American Family. The Wisconsin Supreme Court's opinion in *Chuck Wagon* underscores the interest an employer has in using a covenant not to compete to protect the goodwill accumulated by individual salespersons:

> The purpose of a covenant restraining an agent from competing with his principal after he leaves his principal's service is to prevent for a time the competitive use of information or contacts gained as a result of that service. In many businesses the relationship with customers is the most valuable asset of the enterprise. In recognition of this fact, customer goodwill has been recognized as a property interest in and of itself. Customer goodwill has value to the extent that a customer knows and feels he can rely upon the salesperson he is dealing with. In many cases a business's agent may be the sole contact customers have with that business.

> In any of these situations, the possibility is present that the customer will regard, or come to regard, the attributes of the employee as more important in his business dealings than any special qualities of the product or service of the employer, especially if the product is not greatly differentiated from others which are available. Thus, some customers may be persuaded, or even be very willing, to abandon the employer should the employee move to a competing organization or leave to set up a business of his own.

88 Wis. 2d at 751-52 (internal quotations omitted). *See also Star Direct v. Dal Pra*, 2009 WI 76, ¶ 52, 319 Wis. 2d 274, 767 N.W.2d 898 ("We decline to permit [the employee] to usurp for his own benefit the customers and relationships, and opportunities that [the employer] paid for and invested in.") Admittedly, there is certainly some product differentiation in the insurance industry, but I not do believe that such differentiation substantially diminishes the impact of the court's reasoning in *Chuck Wagon* on the instant case.

On the contrary, the evidence that has been placed into the record indicates that the Agents collectively received thousands of clients from internal transfers within American Family. (DPFOF ¶¶ 30-32.) Furthermore, American Family made substantial investments in the Agents' insurance agencies to ensure the success of those agencies. (DPFOF ¶ 44.) And, at the time of their termination, the Agents had accumulated thousands of clients on behalf of American Family. (DPFOF ¶¶ 36-38.)

Against this backdrop, I have little difficulty in coming to the conclusion that the covenant before the court was reasonably necessary for the protection of American Family. Again, the covenant prohibited the Agents from directly or indirectly inducing a relatively small and identifiable class of American Family policyholders from taking certain negative actions with respect to their in-force policies. Given American Family's substantial investment in the Agents, as well the sheer number of American Family policyholders attributed to the Agents' accounts, this restriction was reasonable.

For all of the foregoing reasons, the Agents' motion for summary judgment as to the enforceability of the covenants not to compete will be denied.

## B. Forfeiture Clause

The Agents argue that one of the provisions in the Agent Agreement—the provision American Family relied upon in withholding the Agent's extended earnings—is unenforceable because it is an unreasonable stipulated damages clause. Specifically, Paragraph 6.u. of the Agent Agreements provides as follows:

> Forfeiture of Extended Earnings – All Companies: u. If you do not comply with all the provisions of this agreement, particularly Sec. 6.k. entitled "Your Activity After Termination," you shall immediately forfeit all rights to extended earnings otherwise payable by any Company thereafter.

(PSOF ¶ 43 (citing Ex. 2 at 5).) Under the Agent Agreements, the amount of commission due to each agent is based upon the agent's years of service with the company and the renewal commissions that are paid to the agent during the 12-month period preceding the termination of the contracts. (*Id.*)

The Agents contend that, "if the court in this case were to find that paragraph 6.k. does meet the requirements of Wis. Stat. § 103.465, there would remain, for resolution at trial, the issue of whether the forfeiture clause invoked by American Family is reasonable." (Pls.' Reply Br. at 8.)

American Family advances two lines of response to this argument: (1) the plaintiffs failed to raise this issue in their summary judgment motion or initial brief and therefore the argument is waived; (2) the evidence will show that the parties intended the pertinent portion of the Agent Agreements as a measure of damages and not as a penalty to the Agents. (Defs.' Reply Br. at 19-20.)

As an initial matter, I am satisfied that the Agents raised this issue in their motion, although I agree with American Family that the Agents' motion would have benefitted from a bit more clarity on the issue. As for the forfeiture clause, in arguing for their respective positions, the parties rely upon the Wisconsin Court of Appeals' decision in *Equity Enterprises, Inc. v. Milosch*, 2001 WI App 186, 247 Wis. 2d 172, 633 N.W.2d 662. In *Milosch*, the court of appeals addressed the stipulated damages clause—a clause not unlike the clause in Paragraph 6.u. of the Agent Agreements—as follows:

The test that the trial court and the appellate court should apply in deciding whether a stipulated damages clause is valid is whether the clause is reasonable under the totality of the circumstances. The reasonableness test is a compromise between two competing viewpoints toward stipulated damages clauses, one favoring enforcement of stipulated damages clauses and the other disfavoring such clauses. The reasonableness test ensures that the court respects the parties' bargain, but prevents abuse. Stipulated damages substantially in excess of injury justify an inference of unfairness in bargaining or an influence of an objectionable *in terrorem* agreement designed to deter a party from breaching the contract, to secure performance, and to punish the breaching party if the deterrent is ineffective.

. . . .

Several factors are helpful in determining whether a particular stipulated damages clause is reasonable: '(1) Did the parties intend to provide for damages or for a penalty? (2) Is the injury caused by the breach one that is difficult or incapable of accurate estimation at the time of contract? and (3) Are the stipulated damages a reasonable forecast of the harm caused by the breach?'

2001 WI App 186, ¶¶ 19-20. The court's opinion in *Milosch* also makes it clear that the issue of whether a stipulated damages clause is valid is a question of law for the court to resolve. *Id.* at ¶ 21.

The court is not yet able to determine whether Paragraph 6.u. of the Agent Agreements is reasonable. To be sure, some of the language in the clause does appear at first glance to be unreasonable, to wit, the use of the word forfeiture and the absence of the terms "damages" or "liquidated damages," allows the court to infer "that the intent of the parties was that the forfeiture would constitute a penalty and was intended to punish an employee who violated any provision of the contract subsequent to the termination of the contract." *See Id.* at ¶ 22. But the court is left with little guidance from the parties with respect to the ability of the parties to estimate any damages in this action or with respect to the ability of the parties to foresee the extent of the harm caused by any breach. As a result, I will reserve my judgment on the reasonableness of the stipulated damages clause in Paragraph 6.u. of the Agent Agreements for a later date. Stated another way, the parties' motions for summary judgment on this issue will be denied.

## C. American Family's Trade Secret Claim

American Family contends that the Agents misappropriated American Family's trade secrets in violation of Wisconsin's Uniform Trade Secrets Act, Wis. Stat. § 134.90. More specifically, American Family contends that "[e]ach plaintiff, in his capacity as an American Family agent, disclosed American Family trade secrets to the competitor corporations created by four of the five Agents months before terminating their Agent Agreements." (Defs.' Br. Supp. Summ. J. at 19.) American Family continues by stating that, as a result of the Agents' actions, "competitor corporations had unfettered access to the American Family ADS database." (*Id.*) American Family contends that the Insurance Agencies knew when they acquired American Family's trade secrets that the Agents had a duty to maintain the secrecy of the information. (*Id.* at 20.)

The Agents offer three reasons that, in their opinion, thwart American Family's attempt to obtain relief on the trade secrets claim. First, the Agents contend that they were not bound under the Agent Agreements to keep the information in the ADS System confidential. Second, the Agents assert that the information included in ADS System does not meet the requirement of a trade secret under Wis Stat. § 134.90. Finally, the Agents contend that, even if the information in the ADS System was entitled to trade secret protection under Wis. Stat. § 134.90, the Agents did not misappropriate the information in the database. (Pls.' Reply Br. at 8-9.)

**Trade Secret**

The Agents offer a number of arguments that they believe establish that the information in American Family's ADS System was not a trade secret. I have reviewed these arguments and, for the reasons stated below, I find them unpersuasive.

The Agents first offer a review of case law issued before Wisconsin adopted the Uniform Trade Secrets Act to support their contention that information contained in customer-lists is not

22

necessarily a trade secret. (Pls.' Br. at 21-22.) I do not need to spend a great deal of time on the Agents' argument here because Wisconsin courts have made it clear that customer lists can be afforded trade secret protection under Wis. Stat. § 134.90, *see, e.g. ECT Int'l, Inc. v. Zwerlein*, 228 Wis. 2d 343, 353, 597 N.W.2d 479 (Ct. App. 1999), and the Seventh Circuit's opinion in *American Family v. Roth*, 485 F.3d 930 (7th Cir. 2007)*,* forecloses any remaining doubt on the matter.

The Agents' stronger argument concerns whether the information contained in the ADS System satisfies the trade secrets' requirements under Wis. Stat. § 134.90. Wisconsin's Trade Secrets Act defines a trade secret as follows:

> Trade secret means information, including a formula, pattern, compilation, program, device, method, technique or process to which all of the following apply:
>
> > 1. The information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.
> >
> > 2. The information is the subject of efforts to maintain its secrecy that are reasonable under the circumstances.

Wis. Stat. § 134.90(1)(c). The Agents argue that the information in the ADS System does not meet this standard. In particular, the Agents contend that "the information, for which trade secret protection is claimed, is readily available from other sources." (Pls.' Reply Br. at 18.)

The Agents point to a number of alternative sources of policyholder information in support of their contention that the information in the ADS System was readily available from other sources. More specifically, the Agents contend that the information in the ADS System could be duplicated as follows: (1) contacting policyholders and gathering information from them; (2) using information compiled in "file folders"; (3) using monthly commission statements; (4) obtaining homeowner information at the local tax assessor; (5) accessing insurance websites that allow agents to access policyholder information. (Pls.' Br. at 25-28.) In particular, the Agents spend a great deal of time

23

stressing that the file folders they maintained on their policyholders provided them with the information available in the ADS System.

American Family's response to this argument is that "the plaintiffs' own stance is that they must rely on a myriad of sources, which would take many months to collect and compile and, even if accomplished, would create a compilation less than American Family's (i.e., plaintiffs' sources fail to capture all sorts of information, including effective and expiration dates, active and inactive policies, out-of-force dates, traffic infractions and demerit points.)" (Defs.' Br. Summ. J. Opp. at 22-23.)

In support of their argument that the information included in the ADS system constitutes a trade secret, American Family points to the Seventh Circuit's decision in *Roth*. *Roth* involved a suit by American Family against a number of defendants—a group of former American Family insurance agents—who "had begun soliciting [American Family's] customers." *Id.* at 931. In finding that the information contained in American Family's database was a trade secret, the Seventh Circuit reasoned that "[t]he names in the plaintiff's database are filtered for their suitability to buy insurance, resulting, as the magistrate judge remarked, in 'a defined, manageable and economically viable universe of uniquely receptive potential customers.'" *Id.* at 933.

Similarly, in the instant case, American Family argues that the information contained in the ADS System constitutes a trade secret because the database includes, "among other things, the policyholder name, address, date of birth, various telephone numbers, email address[es], VIN numbers, all policy types, premium information on all policies, effective and expiration dates on all policies, out-of-force dates, whether each policy is active or inactive, years since major/minor traffic violations, demerit point ranges for given policies, claim history for certain policies, prospect information, history of policyholder contacts and relationship information." (Defs.' Br. Opp. Summ.

J. at 20.)  American Family continues by stating that the ADS system "is highly secure and American Family has spent millions of dollars to roll-out and maintain the security of the database."  (*Id.*)  In conclusion, American Family asserts that "[a]s in *Roth*, because American Family's policyholder information derives independent economic value and is subject to significant efforts to maintain its secrecy . . .  American Family's policyholder information is a trade secret."  (*Id.* at 21.)

After reviewing the Seventh Circuit's opinion in *Roth*, I agree with American Family that the ADS System derives independent economic value from not being generally known to, and not being readily ascertainable by proper means.  As American Family notes, the information in the ADS System includes, among other things, the terms of its policies with the company's clients and an identification of potential clients for the company's insurance salespersons.  Thus, the information contained in the ADS System is not just a combination of otherwise publicly available information compiled in one location for convenience.  In particular, I see no reason to disagree with the Seventh Circuit's conclusion in *Roth* that the information in the ADS System reflects "a defined, manageable and economically viable universe of uniquely receptive potential customers."  485 F.3d at 933.

As for the Agents' file-folder argument, I am satisfied that the file folders did not provide an alternative source of information to the ADS System.  To begin with, Vanyo did not record complete information concerning policyholders in his file folders.  (DPFOF ¶ 46.)  That having been said, the Agents' use of the file folders to collect some information otherwise available in the ADS System may be an indication that some of the information in the ADS System was readily available elsewhere.  But even here, the Agents do not admit the obvious weaknesses in their own argument: the uncontradicted evidence in the record that at least some of the Agents' file folders were, at best, incomplete (*see* Pls.' Resp. DPFOF ¶ 41).  And the record also shows that Donnelly and Jarosch—either directly or through employees—used information from the ADS System in compiling the customer file folders.  (*See*

25

DPFOF ¶¶ 60-62, 78-79.) Stated another way, the Agents' use of the file folders is to a certain extent further proof that the information in the ADS System was not readily available elsewhere. In sum, the Agents' use of the file folders does not establish that the information in American Family's ADS System was readily available elsewhere.

Finally, the record establishes that American Family took significant steps to keep the information in the ADS System confidential. (*See* DPFOF ¶¶ 8-11.) And because the Agents have not offered any evidence to contradict this finding, I am satisfied that, under Wis. Stat. § 134.90(1)(c), American Family took steps to protect the information in its ADS System that were reasonable under the circumstances.

Given the above, I am satisfied that the information in American Family's ADS System was a trade secret.

**Agent Agreements**

The Agents contend that American Family has not established that an amendment to the Agent Agreements referred to as Endorsement #10, which obligates agents of American Family to abide by the company's trade secret policy, was ever agreed to by the Agents in the Agent Agreements. (Pls.' Reply Br. at 11.) While the parties agree that the Agents executed Endorsement #10 as part of their previous Agent Agreements with American Family, the parties offer different versions of what was included with the Agent Agreements. The Agents contend that counsel for American Family implicitly conceded that Endorsement #10 was not executed with the Agent Agreements when counsel did not include Endorsement #10 in his Agent Agreement exhibit offered during the Agents' depositions. (Pls.' Reply Br. at 14.) Next, the Agents contend that an affidavit filed by a custodian of American Family's records, Ken Martin, does not establish that Endorsement #10 was a part of the Agent Agreements. (*Id.*) The Agents also claim that Endorsement #10 is in violation of Paragraph

7.a. of the Agent Agreements, which provides that the Agent Agreements cannot be modified unless the modification is agreed to, in writing, by the parties. (*Id.*)

American Family's initial response to the Agents' argument is to note that the Agents filed unsworn affidavits in support of their position that "never aver[ ] that they did not receive this amendment with their 1993 contracts." (Defs.' Reply Br. at 4.) American Family addresses Paragraph 7.a. of the Agent Agreements by noting that the first page of the Agent Agreements explicitly provides that "[a]ny amendments, endorsements or schedules attached to this agreement become part of this agreement." (*Id.* at 6.) Because Endorsement #10 was included with the Agent Agreements signed by the Agents, American Family asserts that Endorsement #10 was incorporated by reference into the original agreement itself. As for the actions of American Family's counsel in the deposition, American Family states that Endorsement #10 was marked separately during the Agents' depositions. (*Id.*) Finally, American Family points out that the Agents' claim for extended earnings relies on the compensation schedules which were similarly attached to the Agent Agreements. As a result, American Family states that "[the Agents'] contention that only the first 8 pages, which do not contain [Endorsement #10] or the compensation schedules, makes up the entire contract of the parties cannot stand in light of their need and reliance on the compensation schedules for their own contract claim." (*Id*. at 7.)

After reviewing the record in this case, I am unable to determine whether Endorsement #10 was or was not included with the most recent Agent Agreements signed by the Agents. For one thing, the Agents have not offered any definitive evidence that Endorsement #10 was not a part of the Agent Agreements. Indeed, as American Family notes, the Agents' affidavits do not state that Endorsement #10 was omitted from the Agent Agreements, and, even if they did, the affidavits are unsworn. Rather, the Agents have challenged American Family to establish that Endorsement #10 was a part

of the Agent Agreements. For its part, American Family has also not offered anything definitive into the record establishing that Endorsement #10 was included with the Agent Agreements. Instead, American Family has offered print-shop receipts and copies of documents as well as the affidavit of a records custodian. While this evidence may tend to establish that the Agent Agreements included Endorsement #10 at the time of their execution, the record does not unequivocally demonstrate such to be the case.

All of the above leaves this court with American Family's argument that the Agents had a duty to keep American Family's trade secrets confidential. American Family's argument here refers to the text of Wis. Stat. § 134.90, which provides that a trade secret may be misappropriated by, among other things, taking those trade secrets "under circumstances giving rise to a duty to maintain its secrecy or limits its use." Wis. Stat. § 134.90(2). American Family argues that the ADS System included detailed and confidential information that was highly secure and reflected millions of dollars of investment on American Family's part. (Defs.' Reply Br. at 7-8.) American Family continues by asserting that each plaintiff was aware that American Family's policyholder information was confidential. (*Id.* at 8.)

Without legal argument from either party as to what would or would not constitute an implicit agreement to protect the confidentiality of a trade secret, this court has undertaken its own review of the available case law. For its part, the Seventh Circuit had this to say about the topic:

> Wisconsin does not require an express, written contract of confidentiality. . . . [A]n implied undertaking to abide by the trade's norms of confidentiality suffices. *See, e.g., News America Marketing In-Store, Inc. v. Marquis*, 86 Conn. App. 527, 862 A.2d 837 (2004); *Frantz v. Johnson*, 116 Nev. 455, 999 P.2d 351 (2000); *Stampede Tool Warehouse, Inc. v. May*, 272 Ill. App. 3d 580, 651 N.E.2d 209, 209 Ill. Dec. 281 (1st Dist. 1995); *Marsico v. Cole*, 1995 Del. Ch. LEXIS 78 (1995). And breach of an implicit promise to hold information for the client's sole benefit in turn violates the Trade Secrets Act, Wis. Stat. §134.90(2)(a).

28

*Hicklin Eng'g, L.C. v. Bartell*, 439 F.3d 346, 350 (7th Cir. 2006). The Seventh Circuit's opinion in *Hicklin* is one of the few this court's review has found that deals with an independent contractor's duty to maintain the secrecy of a client's trade secret in the absence of a written confidentiality agreement. The *Hicklin* opinion has been characterized as setting forth two situations in which such a duty may arise: "(1) where the independent contractor developed the work product but norms of the trade establish that the client is the owner; or (2) where the client develops the information and a reasonable jury could conclude that the contractor knew that some of the data was meant to be a trade secret, such as where there are trade norms of confidentiality." *MPC Containment Sys. v. Moreland*, No. 05-C-6973, 2008 U.S. Dist. LEXIS 60546 (N.D. Ill. July 23, 2008).

Simply put, American Family has introduced an overwhelming amount of evidence indicating that a reasonable contractor would know that information in the ADS System was a confidential trade secret. The Agents took classes instructing them that American Family's policyholder information was confidential. (*See* DPFOF ¶¶ 103, 104.) The Agent Agreements signed by the Agents also provided that, upon termination, the company's agents must return to American Family all policies, policy records, materials or other property in the Agent's possession. (*See* DPFOF ¶ 102.) Additionally, a number of the Agents stated in their depositions that they considered the information about policyholders inserted into the ADS System as confidential. (*See* Amended DPFOF ¶¶ 95, 96, 99, 100, 101.) Finally, the Seventh Circuit in *Roth* had little difficulty in coming to the conclusion that the information in the ADS System, the same database at issue in this action, constituted a trade secret. 485 F.3d 933-34. Given the foregoing, I am satisfied that American Family has established that a reasonable agent would understand that the information in American Family's ADS System was a trade secret.

**Misappropriation**

American Family contends that the Agents and Insurance Agencies misappropriated American Family's trade secrets, to wit, the contents of the ADS System.

Wisconsin's Uniform Trade Secrets Act defines misappropriation is defined as follows:

(2) Misappropriation. No person, including the state, may misappropriate or threaten to misappropriate a trade secret by doing any of the following:

(a) Acquiring the trade secret of another by means which the person knows or has reason to know constitute improper means.

(b) Disclosing or using without express or implied consent a trade secret of another if the person did any of the following:

1. Used improper means to acquire knowledge of the trade secret.

2. At the time of disclosure or use, know or had reason to know that he or she obtained knowledge of the trade secret through any of the following means:

a. Deriving it from or through a person who utilized improper means to acquire it.

b. Acquiring it under circumstances giving rise to a duty to maintain its secrecy or limit its use.

c. Deriving it from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use.

d. Acquiring by accident or mistake.

Wis. Stat. § 134.90(2). Wisconsin law broadly defines "person" to include a corporation. Wis. Stat. § 990.01(26).

The court has reviewed the arguments presented by the parties on the issue of misappropriation. Specifically, the parties have submitted considerable evidence as to the Agents' and Insurance

30

Agencies' activities during the time period surrounding the Agents' termination of their Agent Agreements. For the reasons discussed below, the court finds that material issues of fact remain with respect to whether the Agents misappropriated American Family's trade secrets.

American Family has submitted the following evidence: (1) the Agents ran comprehensive queries on the ADS System shortly before terminating their Agent Agreements; (2) the Agents or their employees, with varying frequency, submitted information from the ADS System into the file folders that were used (also with varying frequency) in compiling the Fiserv Databases and in contacting potential clients on behalf of the Insurance Agencies; (3) the Agents and Insurance Agencies relied upon the information in the Fiserv Databases in soliciting customers. American Family further asserts that a review of the file folders maintained by the Agents establishes that the file folders were frequently incomplete and could not have furnished the policyholder information the Agents placed into the Fiserv Database.

The Agents (with the exception of Vanyo) respond that the only information they took with them from American Family came from the paper files the Agents maintained and not from American Family's ADS System. The Agents also maintain that a series of monthly commission statements that American Family sent to the Agents after their termination provided much of the information that American Family claims was obtained from the ADS System. Finally, the Agents contend that, following the Agents' termination of their Agent Agreements, American Family searched and cleansed the hard drives of the Agents' computers. (Pls.' Reply Br. at 29.) As a result of American Family's activities, the Agents claim that American Family has destroyed the evidence that would allow the Agents to establish that they did not misappropriate the information in the ADS System by transferring the information to the Fiserv Databases.

31

After reviewing the parties' submissions on the issue of misappropriation, I reiterate that material issues of fact remain on the subject. In particular, the court has no way of knowing whether the Agents directly lifted information from the ADS System into the Fiserv Databases or, in the alternative, whether the Agents placed information from the ADS System into the file folders that were then used in compiling the Fiserv Database. For the foregoing reasons, American Family's motion for summary judgment on its trade secret claim will be granted in part and denied in part.

Finally, the parties have filed numerous motions in this case with respect to outstanding discovery issues. To the extent that any motions have not already been resolved by this court, such motions will be denied without prejudice.

**NOW THEREFORE IT IS ORDERED** that the plaintiffs and third-party defendants' motion for summary judgment be and hereby is **DENIED**;

**IT IS FURTHER ORDERED** that the defendants and third-party plaintiffs' motion for summary judgment be and hereby is **GRANTED IN PART** to the extent that such motion seeks to establish that the information in American Family's ADS System is entitled to trade secret protection;

**IT IS FURTHER ORDERED** that the defendants and third-party plaintiffs' motion for summary judgment be and hereby is **DENIED IN PART** in that material issues of fact remain on whether the Agents and the Insurance Agencies misappropriated American Family's trade secrets;

**IT IS FURTHER ORDERED** that any outstanding motions to compel in this action be and hereby are **DENIED WITHOUT PREJUDICE**;

**IT IS FURTHER ORDERED** that on April 14th at 10:15 a.m. in Room 253 of the United States Courthouse, 517 E. Wisconsin Ave., Milwaukee, Wisconsin, a scheduling conference will be conducted to discuss with the parties the further processing of this case to final resolution.

32

**SO ORDERED** this <u>30th</u> day of March 2010 at Milwaukee, Wisconsin.

**BY THE COURT:**

<u>s/ William E. Callahan, Jr.</u>
WILLIAM E. CALLAHAN, JR.
United States Magistrate Judge