# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

BOB JAROSCH, JOHN VANYO,
TOM DONNELLY, DONNELLY INSURANCE
AGENCY, INC., and GARY SWANIGAN,

        Plaintiffs,

        v.                                Case No. 07-C-0212

AMERICAN FAMILY MUTUAL INSURANCE
COMPANY, AMERICAN FAMILY LIFE INSURANCE
COMPANY, and AMERICAN STANDARD INSURANCE
COMPANY OF WISCONSIN,

        Defendant-Third Party Plaintiffs,

        v.

JAROSCH INSURANCE AGENCY, INC., VANYO
INSURANCE GROUP, INC., DONNELLY INSURANCE
GROUP, INC., GARY SWANIGAN INSURANCE
AGENCY, INC., COURI INSURANCE ASSOCIATES, LLC,
and COURI INSURANCE ASSOCIATES WEST, LLC,

        Third Party Defendants.

---

## DECISION AND ORDER FOLLOWING BENCH TRIAL

---

## I.  INTRODUCTION

From August 23-27, 2010, a trial to the court was conducted in this action.  Thirteen

witnesses testified: Gerald Couri ("Couri"), Robert Jarosch ("Jarosch"), Gary Swanigan

("Swanigan"), Thomas Donnelly ("Donnelly"), Mark Boettner ("Boettner"), John Vanyo ("Vanyo"),

Kenneth Harrison ("Harrison"), Craig Reinmuth ("Reinmuth"), Kenneth Martin ("Martin"), James

Madden ("Madden"), Randy Vogler ("Vogler"), Thomas Clifford ("Clifford"), and Gaylene Stingl

("Stingl"). Following the completion of the receipt of evidence, the parties asked for and received an opportunity to obtain a trial transcript and thereafter file post-trial briefs.

Upon completion of the first round of briefing, the plaintiffs filed a motion seeking various forms of relief stemming from their post-trial discovery of some material evidence that had not been previously provided by the defendants. The court's resolution of the motion required, *inter alia*, that the post-trial briefing be suspended, pending further analysis of the tardy discovery and a hearing to supplement the trial record. This supplementary hearing was conducted on March 7, 2011. The parties thereafter filed further post-trial briefs. The post-trial briefing has now been completed and the case is ready for resolution by the court.

The court has jurisdiction over this action pursuant to 28 U.S.C. § 1332, diversity of citizenship: the plaintiffs are citizens of Arizona; the third party defendant insurance agencies are citizens of Arizona; American Family Mutual Insurance Company, American Family Life Insurance Company, and American Standard Insurance Company (collectively referred to as "American Family") are citizens of Wisconsin; and Couri Insurance Associates, LLC ("CIA") and Couri Insurance Associates West, LLC ("Couri West")[1] are citizens of Wisconsin; and the matter in

---

[1] In the plaintiffs'/third party defendants' post-trial response brief and supplemental post-trial findings of fact, it was brought to this court's attention that Couri West was not formed until December 7, 2006. The plaintiffs and third party defendants state that "American Family offers no explanation as to how the Court could enter a judgment against Couri West when the company did not exist when many of the events giving rise to the claims asserted by American Family occurred." (Pls.' Post-Tr. Resp. Br. 5.) American Family had no opportunity to respond, as this was the last round of briefing. However, a visit to the Wisconsin Department of Financial Institutions website, which the plaintiffs cite in support of this proposed fact, reveals that, indeed, Couri Insurance Associates West, LLC was not registered until December 7, 2006. S*ee* https://www.wdfi.org/apps/CorpSearch/Details.aspx?entityID=C067456 &hash=1728120568&searchFunctionID=6b08e48e-179d-45ad-9bb3-bb740379ad78&type=Simple &q=couri+insurance+associates+west%2c+llc (last visited September 6, 2011).
Unless American Family can demonstrate how Couri West aided and abetted a breach of the plaintiffs' respective contracts and tortiously interfered with their contracts, American Family's claims against Couri West must fail. A review of the evidence demonstrates American Family's failure to

controversy exceeds $75,000. Venue is proper in the Eastern District of Wisconsin pursuant to 28 U.S.C. § 1391(a). The following shall constitute the court's findings of fact and conclusions of law in accordance with Federal Rule of Civil Procedure 52.

## II. FACTUAL BACKGROUND

In 2006, each of the plaintiffs ceased being captive insurance agents for American Family, opting, instead, to work as independent insurance agents with CIA, an American Family competitor. Several months before they terminated their relationships with American Family, each of the plaintiffs began meeting with CIA representatives. After numerous meetings with CIA personnel, and before terminating their American Family Agent Agreements (hereinafter "Agent Agreements"), the plaintiffs signed corporate documents with CIA establishing their intent to form new insurance agencies whereby CIA would be a 50% shareholder in each agency with the named agent as the other 50% shareholder.

After the plaintiffs decided to form new insurance agencies, but before they terminated their employment with American Family, they, among other things, bought computers for their new agencies, created and established a new electronic database (hereinafter "FSC Database"),[2] and learned how to quote insurance for their new agencies. Before terminating employment with American Family (or as of the effective date of termination in Jarosch's case), the plaintiffs sent out letters to their American Family policyholders notifying them of their career change. Then, after more than fifteen years of employment with American Family, the plaintiffs abruptly terminated their

do just this. No showing has been made as to how Couri West participated in any of the actions that form the basis for American Family's claims. The actions giving rise to American Family's claims occurred before Couri West was even formed. Therefore, American Family's claims against Couri West will be dismissed.

[2] The FSC Database was also referred to as Fiserve throughout the trial in this case, and those terms will thus be used interchangeably.

3

respective employment contracts with American Family. More specifically, the plaintiffs terminated their relationships with American Family as follows: (1) Swanigan on February 28, 2006; (2) Donnelly on June 5, 2006; (3) Jarosch on September 11, 2006; and (4) Vanyo on October 9, 2006.

Following their termination from American Family, the plaintiffs separately incorporated their new insurance agencies in Arizona. The newly formed insurance agencies (also referred to as "competitor corporations") were incorporated respectively as Gary Swanigan Insurance Agency, Inc., Donnelly Insurance Group, Inc., Jarosch Insurance Agency, Inc., and Vanyo Insurance Group, Inc.—all of which are named as third party defendants in this action. The plaintiffs also served as officers in each of their newly-incorporated agencies.

In the last few months before leaving American Family, the plaintiffs began entering American Family policyholder information into their FSC Databases for the benefit of their new insurance agencies. The types of information entered with respect to each policyholder and from where the plaintiffs got the information to enter into their new databases is a source of debate in this action.

The plaintiffs, with the exception of Vanyo (who admitted taking certain information from American Family's electronic database (hereinafter "ADS System"), maintain that the information entered into the FSC Databases came solely from information stored in the file folders that they maintained for each of their policyholders. American Family contends that the plaintiffs took information directly from the ADS System. Each of the plaintiffs used the ADS System to store information about his American Family policyholders, including name, address, date of birth, telephone number, email address, VIN number, all policy types, premium information on all policies, effective and expiration dates on all polices, out-of-force dates, whether each policy is active or inactive, years since major and minor traffic violations, demerit point ranges for given policies, claim

4

history for certain policies, prospect information, history of contacts with policyholders, and relationship information. The ADS System also contained information on prospective policyholders. In the months leading up to their termination, the plaintiffs ran numerous ADS queries, obtaining large amounts of policyholder information. In some cases, those lists were either downloaded, printed, or exported to Microsoft Excel.

Since the first day of operating their new insurance agencies, the plaintiffs began re-writing insurance for their former American Family policyholders. In fact, the plaintiffs have been quite successful as independent insurance agents, and have re-written insurance for many of their former American Family policyholders. Central to this litigation are the plaintiffs' Agent Agreements.

## III. DISCUSSION

Jarosch, Swanigan, Donnelly, and Vanyo allege a breach of contract by American Family in failing to pay them the termination commissions due to them under their contractual agreements. Jarosch, Swanigan, Donnelly, and Vanyo also claim that American Family owes them their life insurance commissions.

American Family asserts the following counterclaims against the plaintiffs: (1) breach of contract; (2) misappropriation of trade secrets; and (3) violation of the Computer Fraud and Abuse Act ("CFAA"). Additionally, American Family asserts the following claims against the third party defendants: (1) aiding and abetting breach of contract; (2) tortious interference with its contracts with the respective plaintiffs; (3) aiding and abetting the plaintiffs' misappropriation of its trade secrets; and (4) aiding and abetting the plaintiffs' breach of the CFAA. I will analyze each claim below.

### A. Breach of Contract Claim and Counterclaim

The parties spend a good deal of space in their respective briefs arguing whether Section 6.u. of the Agent Agreement is enforceable. The plaintiffs and third party defendants argue that it is an

unenforceable penalty provision. The defendants argue that it is an enforceable stipulated damages clause. But, before its enforceability is determined, it is necessary to decide whether the plaintiffs breached their Agent Agreement in the first instance. After all, the question of whether Section 6.u. sets the amount of damages for a breach or, alternatively, whether breach of contract damages need to be proven independently of such clause becomes necessary to resolve only if a breach of the contract has been proven.

American Family alleges that the plaintiffs violated the following provisions of their respective Agent Agreements: (1) Section 6.k.; (2) Endorsement 10 and Section 4.l.; and (3) Section 4.a. and 4.i.

1. Non-Compete Provision: Section 6.k.

Section 6.k. of the Agent Agreement that each of the plaintiffs signed states:

For a period of one year following termination of this agreement, you will not either personally or through any other person, agency, company or organization directly or indirectly induce, attempt to induce or assist anyone else in inducing or attempting to induce any policyholder of the Companies credited to your account at the time of termination to lapse, cancel, replace or surrender any insurance policy in force with the Companies. In the event the "period of one year" conflicts with any statutory provisions, such period shall be the period permitted by statute.

(Ex. 1083.)

The defendants argue that each of the plaintiffs breached the non-compete provision of the Agent Agreement (Section 6.k.) by, among other things, contacting persons to whom they had sold policies while the plaintiffs were American Family agents, inducing them to cancel their American Family policies, and buying new policies from other companies, thereby causing American Family to lose out on future premium payments.

6

In contrast, the plaintiffs argue that they did not violate the non-compete provision of the Agent Agreement because they did not "solicit" business from such policyholders; instead, at most, they merely notified them of their change of business and invited the policyholders to contact them.

The evidence demonstrates that at or about the time they had notified American Family that they were terminating their agency relationship with American Family, the plaintiffs sent letters to their former customers, i.e., the active policyholders that they had at the time they left American Family. Rather than paraphrase any of the letters sent out by the plaintiffs, the text of each letter will be set out in full below.

Swanigan first gave notice to American Family of termination of the Agent Agreement on February 28, 2006, with an effective date the following day of March 1, 2006. On February 27, 2006, Swanigan sent out a letter stating the following:

**RE: GREAT NEWS**

Dear Friends,

The Swanigan agency is changing for the better! Wanda, Tricia and I are pleased to announce that as of March 1, 2006, we have formed a new independent agency and have retired from American Family Insurance.

After careful research and planning, we have decided to affiliate ourselves with Couri Insurance Associates, a very large and successful independent insurance association that represents more than 100 individual agencies.

The Gary Swanigan Insurance Agency Inc will now be able to provide even better service than before at GREAT rates. We will represent only top quality insurance carriers with a proven record of quality and service. We will also be able to provide additional benefits and services that were unavailable to us previously.

Our office location, hours of operation and phone number will remain the same and we will be available to help new clients at 8:00 am, March 1, 2006.

We would like to thank you for your past business and loyalty.

7

Thank you,

Gary R Swanigan

(Ex. 1091.)

Jarosch first gave notice to American Family of termination of his Agent Agreement on September 8, 2006, with termination effective September 11, 2006. On September 11, 2006, Jarosch sent out a letter that stated the following:

**To My Valued Clients:**

I am excited to announce that effective September 11, 2006 we will leave American Family Insurance to own and operate an Independent Insurance Agency.

30 years with American Family Insurance has gone by fast. The knowledge and experience is invaluable. Changing market conditions and careful consideration are the reasons I must establish myself as an independent insurance agent.

My new agency will allow me to provide a more diversified insurance policy selection. Customizing client's needs, large or small, with the industries most competitive prices. The client service I have provided in the past will continue.

Our office location along with our phone number will remain the same. Business hours are Monday through Friday 9:00 to 5:00, with evenings and Saturdays by appointment.

Lorelei and I would like to thank you again for your confidence and allowing us to serve you with your insurance needs.

Sincerely,

Bob and Lorelei Jarosch

Jarosch Insurance Agency, Inc.

(Ex. 1112.)

8

Vanyo first gave notice to American Family of termination of his Agent Agreement on October 9, 2006, with termination effective that same day. On October 7, 2006, Vanyo sent out a letter that stated the following:

**Re: GREAT NEWS**

Dear Friends and Valued Customers:

The Vanyo Insurance Agency is changing for the better! After careful research and planning Susan and I are pleased to announce that as of **October 9, 2006** we have formed a new independent agency and have chosen to end our affiliation with American Family.

The **Vanyo Insurance Group** will continue to provide outstanding service to our clients. We represent several major insurance carriers, enabling us to provide competitive packages individually tailored to meet our client's specific personal and commercial needs.

Our office location, hours of operation and phone number will remain the same and we will be available to help new clients at 8:00 am, October 9, 2006.

We thank you for your past business and loyalty, we appreciated you as a client.

Sincerely,

John Vanyo

(Ex. 1173.)

Donnelly and Corporate Donnelly first gave notice to American Family of termination of the Agent Agreement on Friday, June 2, 2006, with an effective date of Monday, June 5, 2006, at 12:01 a.m. On June 2, 2006, Donnelly sent out a letter that stated the following:

**Re: Exciting News Release**

Dear Friends,

For the past 16 years that my agency has been with American Family Insurance, I've gained invaluable experience and long lasting friendships. However, after thoughtful consideration and due to changing market conditions, I have ended my relationship

9

with American Family and have established **Donnelly Insurance Group** as an independent insurance agency.

Donnelly Insurance Group is affiliated with Couri Insurance Associates in an effort to offer a more diversified product line. Couri Insurance Associates represents more than 100 quality insurance companies, which will allow our agency to, without compromise to outstanding service, provide competitive packages individually tailored to meet our clients' specific personal and commercial needs. We will also be able to access other product lines and services which were unavailable to us previously.

Donnelly Insurance Group will continue at our current location. Hours of operation and phone numbers are the same, and we will be welcoming new clients as of June 5, 2006.

Your business, friendship and loyalty over the years has been greatly appreciated.

Thank you,


Tom Donnelly

(Ex. 62.)

Thereafter, should any former American Family policyholders who received such letters contact them, the testimony demonstrates that each of the plaintiffs would be careful to not verbally ask for the customer's business. Rather, the plaintiffs would provide an insurance quote only if the customer asked for one. By engaging in such practice, the plaintiffs believed they would not be violating the non-compete provision of the Agent Agreement.

Indeed, each of the plaintiffs identified written form statements that they would have such customers sign as evidence that the plaintiffs did not "solicit" such business. The actual text of such statements is set forth below.

1) Swanigan's form statement reads as follows:

I was not solicited by Gary Swanigan Insurance Agency for my insurance.

I further authorize Gary Swanigan Insurance Agency Inc to retain and use confidential information regarding my personal records, such as Driver License numbers, Social Security numbers and other data relevant to my insurance records.

I initiated the contact for my insurance needs.

(Ex. 43.)

2) Jarosch's form statement reads as follows:

We were not solicited by Jarosch Insurance Agency, Inc. for our insurance.

We further authorize them to retain and use confidential information regarding my personal records, such as driver license number, social security numbers and other data relevant to my insurance records.

We initiated the contact for our insurance needs.

(Ex. 44.)

3) Vanyo's form statement reads as follows:

I was not solicited by the Vanyo Insurance Group for my insurance.

I further authorize the Vanyo Insurance Group to retain and use confidential information regarding my personal records, such as Drivers License numbers, Social Security numbers and other data relevant to my insurance records.

I initiated the contact for my insurance needs.

(Ex. 45.)

4) Donnelly's form statement reads as follows:

I was not solicited by Donnelly Insurance Group, Inc for my insurance.

I further authorize Donnelly Insurance Group, Inc to retain and use confidential information regarding my personal records, such as Driver License numbers, Social Security numbers and other data relevant to my insurance records.

I initiated the contact for my insurance needs.

(Ex. 42.)

Aside from the noticeable textual similarity that each of the form statements bear to one another, and aside from the obvious self-serving (not to mention hearsay) nature of the statements, such statements display a fundamental misunderstanding of the obligation that the Agent Agreements placed upon each of the plaintiffs. Indeed, during their trial testimony the plaintiffs themselves reconfirmed that misunderstanding of such obligation (regardless of whether such misunderstanding was arrived at intentionally or unintentionally). More particularly, they each testified that they understood their obligation was to not "solicit" business. At least for some, this "misunderstanding" was based on remarks that they claim to have had heard other agents and employees of American Family make over the years concerning the non-compete provision.

Simply stated, however, the clear and unambiguous language of Section 6.k. did not merely prohibit the plaintiffs, for a period of one year, from "soliciting" insurance business from any policyholder "of the Companies credited to [the plaintiff's] account at the time of termination." Rather, Section 6.k. prohibited the plaintiffs, for a period of one year following termination of the agreement, from "personally or through any other person, agency, company or organization directly or indirectly *induc[ing], attempt[ing] to induce or assist[ing] anyone else in inducing or attempting to induce* any policyholder of the Companies credited to [the agent's] account at the time of termination to lapse, cancel, replace or surrender any insurance policy in force with the Companies." (Ex. 1083; emphasis added.)

In my opinion, the efforts made by each of the plaintiffs to contact their active policyholders and advise them, not only of their new professional endeavors, but more importantly of their ability to serve such policyholders better than they were able to do in their prior positions, constituted attempting to induce such policyholders to "lapse, cancel, replace or surrender" insurance policies

then in force with American Family.  Indeed, in their post-trial brief, the plaintiffs themselves state as follows:

> The Plaintiffs contend that the restriction on post termination activities set forth in section 6.k. of the contract did not prohibit rewriting of the insurance business of former American Family policyholders *provided* that the American Family policyholder initiated the contact with the Plaintiff, and requested the Plaintiff's assistance in providing insurance coverage.  That is, although the language of section 6.k. prohibits any action which would directly or indirectly induce, or attempt to induce, those former American Family policyholders to cancel, surrender or replace their insurance coverages, it does not prohibit the Plaintiff from rewriting that business provided that the policyholder initiates the contact with the former agent.

(Pls.' Post Tr. Br. 10.)

The plaintiffs have well stated the issue.  Regrettably for them, the facts reveal that it was the plaintiffs themselves who initiated contact with the former American Family policyholders by virtue of the letters announcing their departure from American Family and suggesting in such letters that they could provide better service than they were able to provide with American Family.  ("We will be able to provide additional benefits and services that were unavailable to us previously." (Swanigan letter); "My new agency will allow me to provide a more diversified insurance policy selection. Customizing client's needs, large or small, with the industries most competitive prices." (Jarosch letter); "The Vanyo Insurance Agency is changing for the better! . . . We represent several major insurance carriers, enabling us to provide competitive packages individually tailored to meet our client's specific personal and commercial needs." (Vanyo letter); "Donnelly Insurance Group is affiliated with Couri Insurance Associates in an effort to offer a more diversified product line.  Couri Insurance Associates represents more than 100 quality insurance companies, which will allow our agency to, without compromise to outstanding service, provide competitive packages individually tailored to meet our clients' specific personal and commercial needs.  We will also be able to access other product lines and services which were unavailable to us previously." (Donnelly letter)).

13

To be sure, it may be difficult to define exactly when a particular act by one individual is transformed into an inducement of a second individual. After all, what is an inducement to one potential customer may turn out to not be an inducement to another potential customer. And given that no policyholders testified at trial concerning what ultimately motivated them to change carriers, it would be pure speculation to say that they were in fact "induced" by the plaintiffs to do so. But it is not difficult to conclude why the plaintiffs contacted their active policy holders—it was "to encourage" or "to tempt" (to use the words of plaintiff Swanigan in defining the word "induce," (Tr. 276)) such policyholders to do business with the plaintiffs. Indeed, Webster's International Dictionary defines "induce" as "to move and lead (as by persuasion or influence)." Webster's Third New International Dictionary of the English Language 1154 (1993). At a minimum, applying such definition to the above-quoted letters and follow-up conversations makes clear that these steps taken by the plaintiffs amounted to *attempts* to induce the active policyholders to do business with the plaintiffs and to replace American Family policies with policies of another company.

Such being the case, I am persuaded that the plaintiffs did, indeed, breach Section 6.k. of their respective Agent Agreements.

2. Endorsement 10 and Section 4.l.

Before addressing American Family's argument that the plaintiffs breached Endorsement 10, it must first be determined whether Endorsement 10 is a part of the plaintiffs' Agent Agreements. Endorsement 10 states, in pertinent part, as follows:

> The agent agrees to maintain hard copy records as are determined to be kept by Staff Underwriting and set out in an exhibit form to be attached to and become a part of this agreement.

> These records become the property of the Company and the agent shall become bailee thereof for its own use and benefit while operating under the terms of this agreement and shall preserve such records and shall deliver the records to the Company at the

termination of this agreement.  The agent shall make these records available for review from time to time by personnel designated by the Company.

The agent agrees that software and data base provided under this agreement contains confidential, proprietary and trade secret information and that the agent and its employees will not use nor disclose to third parties such information unless in the ordinary course of the agent's business with the Company.

The original and any copies made in whole or in part of the system software shall become and remain the property of the Company and shall be returned to the Company at the termination of this agreement.

(Ex. 1126.)  Jarosch signed Endorsement 10 on November 17, 1986.  (Ex. 1126.)  Swanigan signed Endorsement 10, but the signature page is not dated.  (Ex. 1083.)  Vanyo signed Endorsement 10 on January 6, 1992.  (Ex. 1140.)  Donnelly signed Endorsement 10 on February 18, 1991.  (Ex. 1133.)

Each of the plaintiffs also signed an American Family Agent Agreement, effective January 1, 1993.  Within each of their Agent Agreements is a provision that states that "[t]his agreement supersedes all prior agreements between you and the Company, whether written or oral, and constitutes the entire agreement.  Except as provided in this agreement, no modification of its terms may be made unless that modification is agreed to in writing by you and the Company." (Ex. 1126 at § 7.a.)  Despite this language, American Family contends that an Amendment to the 1993 Agent Agreements indicated that certain endorsements under the plaintiffs' prior agreement, including Endorsement 10, remained in force and effect following the 1993 agreement.  That Amendment claims that "[a]ny Defacto Agreement or endorsement, any Document Retention Exhibit or endorsement, any endorsement concerning Long-Term Disability Insurance Benefits under your prior agreement shall remain in force and effect under this agreement." (Ex. 1126.)  The Amendment also states that "[y]ou and the Company further agree that this amendment becomes part of your American Family Agent Agreement, edition January 1993, and that Agreement replaces any prior Agent Agreement including amendments or endorsements except as specifically set forth in this

amendment." (Ex. 1126.) The plaintiffs deny ever having received this Amendment when they received and signed their respective 1993 Agent Agreements.

American Family no longer possesses the original contracts entered into by the plaintiffs and American Family. However, American Family contends that the Print Shop Request Form from November 5, 1992 evidences that the Amendment was part of the 1993 contracts. The November 5, 1992 Print Shop Request Form demonstrates that American Family ordered 2,500 copies of the Agent Agreement as well as 2,500 copies of the "Amendment to Am Family Agent" for the Midland region, which included agents in Arizona. (Ex. 1148.)

While American Family's destruction of the original Agent Agreements dismays me, such destruction does not necessarily mean that the Amendment was not attached to the 1993 Agent Agreement when presented to the plaintiffs for signature. Rather, logic suggests that the Amendment was attached to each of the plaintiff's American Family Agent Agreements. The Amendment bears the same American Family imprimatur as the imprimatur on the Agent Agreement, and the Amendment also bears a date of January 1993. It would be odd for American Family to request 2,500 copies of the Agent Agreement as well as 2,500 copies of the Amendment and then not attach the Amendment to the Agent Agreement.

Conversely, the plaintiffs offered equivocal, and even contradictory testimony, with respect to whether they received the Amendment. For example, Jarosch testified as follows:

Q. Mr. Jarosch, it's your understanding that this amendment is part of your 1993 agreement with American Family, correct, sir?

A. Yes.

(Tr. 187-88.) Swanigan testified that he could not say for certain whether the Amendment was part of the contract that was presented to him for signature. (Tr. 262-64.) Swanigan, when asked whether he agreed that the provision in the Amendment giving effect to prior endorsements was binding on

16

him and American Family, replied "I would assume so, yes." (Tr. 260-61.) Additionally, the plaintiffs' faded memory of where or when they received copies of the Agent Agreements, who presented the Agreements to them, to where or whom they sent the signed contracts, and even their unfamiliarity with their contracts undermines, to some degree, their strong conviction that they never received copies of the Amendment. (Tr. 97, 260-62, 458, 363.)

Furthermore, it is telling that Jarosch, Swanigan, and Donnelly do not dismiss the Amendment in its entirety. As stated above, they rely on it not being part of the contract to support their defense to American Family's breach of contract claim. However, in claiming entitlement to their extended earnings credit for their service as American Family agents before 1993, they rely on the Amendment being part of the Agent Agreement. (Tr. 184-88, 258-60.) Specifically, the Amendment states that "[y]ou will receive credit under Sec. 6.l. 2[] for the period of time you have represented the Company under your prior American Family Agent Agreement if that period of time was continuous and uninterrupted. This credit is in lieu of any other payments or credits under that prior agreement." (Ex. 1126.) Neither Jarosch, nor Swanigan, nor Donnelly disputed American Family's calculation of their extended earnings, which accounted for their years of service under prior contracts, and they could not offer any other contractual provision aside from the provision in the Amendment that would give them credit for service under their prior contracts. (Tr. 184-87, 258-61, 388.) The plaintiffs cannot have it both ways.[3] The plaintiffs' reliance on the same Amendment that

---

[3] Vanyo testified that he believed his extended earnings were calculated correctly based on 13 years of service, which included the time from January 1, 1993 to 2006. However, Vanyo also testified that he participated in the Advance Compensation Plan when he began his employment with American Family in 1991. Under his Agent Agreement, the period for which he was eligible for Extended Earnings would "be interrupted from the effective date of any Advance Compensation Plan [he] sign[s] until two years after the effective date of [his] plan or the termination date of [his] plan, whichever comes first." (Ex. 1140 § 6.l.2.) The Amendment also indicates that "any Agent's Advance Compensation Plan entered into by you and the Company prior to the effective date of this American Family Agent Agreement will continue under this agreement as if entered into while this

they distance themselves from reveals their awareness of the Amendment and further supports the finding that it was, indeed, attached to their 1993 American Family contracts.

Finally, the plaintiffs' argument that the Amendment and Endorsement 10 are not a part of their American Family contracts because they were not agreed to in writing by both the agent and American Family is without merit. To be sure, Section 7.a. reads as follows: "Except as provided in this agreement, no modification of its terms may be made unless that modification is agreed to in writing by you and the Company." (Ex. 1126.) However, the front page of the Agent Agreements specifically states that any amendments or endorsements attached to the agreement became a part of the agreement. Thus, the Amendment and therefore Endorsement 10 were incorporated by reference into the original agreement itself, thus obviating the need for either document to be "agreed to in writing by" the plaintiffs and American Family, pursuant to Section 7.a. of the Agent Agreement.

That the plaintiffs testified that copies of the Amendment were not attached to their copies of the Agent Agreement (which were received when American Family mailed back the signed agreement) is not dispositive. What matters is whether copies of the Amendment were attached to the Agent Agreement when the plaintiffs signed it. And, I am persuaded that the Amendment was attached to each of the plaintiffs' 1993 respective Agent Agreements. Under the language of the contract stating that "[a]ny amendments, endorsements or schedules attached to this agreement become a part of this agreement," (Ex. 1126), the Amendment, and thus, Endorsement 10, are part of the plaintiffs' contracts with American Family.

_____

agreement was in force." (Ex. 1140.) Because American Family has demonstrated that Vanyo's eligibility for extended earnings was reduced by two years due to his participation in the Advance Compensation Plan, Vanyo's argument that American Family's 13-year extended earnings calculation was in accordance with his not having received the Amendment is unpersuasive.

18

Pursuant to Endorsement 10, the plaintiffs' hard copy records became the property of American Family, making the information contained in the files "confidential, proprietary and trade secret information." Because the plaintiffs have admitted to taking information from their hard copy records and inputting such information into Fiserve, they used and/or disclosed that confidential information, in violation of Endorsement 10. Indeed, the plaintiffs concede that, if Endorsement 10 is found to be part of the Agent Agreement, "then the compilation of the FSC database would, in accord with the *Roth* decision, constitute a breach of that contractual provision because the right to use the information was 'granted to' American Family under the terms of Endorsement No. 10." (Pls.' Post Tr. Resp. Br. 30.)

In sum, I find that the plaintiffs breached Endorsement 10 of their respective Agent Agreements.[4]

### 3. Section 4.a. and 4.i. and Duty of Loyalty

American Family also argues that the plaintiffs breached their respective duties of loyalty to American Family. The plaintiffs, as independent contractors of American Family, argue that the "common law duty of loyalty . . . has no application to the contract at issue in this litigation because the Plaintiffs were not employees of American Family." (Pls.' Post Tr. Resp. Br. 13.) However, the plaintiffs provide no authority for this proposition. Alternatively, the plaintiffs argue that because the common law duty of loyalty owed by an employee is limited to "key employees" of the company, no duty was owed here because the plaintiffs were not key employees of American Family. I disagree with the plaintiffs, for two reasons.

---

[4] A finding that the plaintiffs breached Endorsement 10 by using and/or disclosing confidential information obviates the need to determine whether the plaintiffs breached Endorsement 10 by failing to return all policy and policy records for which they were bailees upon termination of employment with American Family.

First, an independent contractor may owe a common law duty of loyalty to his "employer." According to the Restatement, "[a]n agent may be one for whose physical acts the employer is not responsible and who is called an independent contractor in order to distinguish him from a servant, also an agent, for whose physical acts the employer is responsible." Restatement (Second) of Agency § 1, comment e (1958). Moreover, agency is defined as "the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act." Restatement (Second) of Agency § 1(1). Therefore, independent contractors can be agents. *See* Restatement (Second) of Agency § 2(3) (an independent contractor "may or may not be an agent"); *see also Barnes v. Lozoff*, 20 Wis. 2d 644, 649, 123 N.W.2d 543, 546 (1963) (stating that engineer, although an independent contractor, was in a relationship with his employer that was characterized as one of trust and confidence and thus "good faith and loyalty to his employer constitute[d] a primary duty" of the engineer). Thus, the line between employees and independent contractors is not as bright as the plaintiffs portray it to be.

The plaintiffs' argument that they owed no fiduciary duty to American Family because they were not "key employees" of the company also fails. "[A]t least key employees in Wisconsin owe to their employer common-law duties of loyalty." *Aon Risk Servs., Inc. v. Liebenstein*, 2006 WI App 4, ¶ 26, 289 Wis. 2d 127, 710 N.W.2d 175. Whether an employee is a "key employee" depends on the precise nature of his or her employment duties. *See Burbank Grease Servs., LLC v. Sokolowski*, 2006 WI 103, ¶ 42, 294 Wis. 2d 274, 717 N.W.2d 781, *aff'd in part, rev'd in part*, 2006 WI 103, 294 Wis. 2d 274, 717 N.W.2d 781. Moreover, in *Greenberg v. Stewart Title Guaranty Co.*, 171 Wis. 2d 485, 498, 492 N.W.2d 147, 153 (1992), the Wisconsin Supreme Court held that "[a]n agent of an insurance company owes a duty only to the insurance company." Implicit in this holding is that an insurance agent, because he owes a duty of loyalty to the insurance company, is a "key employee"

of the insurance company. Accordingly, under Wisconsin law, the plaintiffs owe American Family a fiduciary duty.

Second, and more importantly, American Family relies, not on the plaintiffs' common law duties of loyalty, but on the duties of loyalty imposed by the plaintiffs' respective Agent Agreements. A claim for the breach of an agent's duty of loyalty may sound both in tort and in contract. *See Sokolowski*, 2006 WI 103, ¶ 42 (citing *Aon Risk Servs.*, 2006 WI App 4, ¶ 8; *Harman v. La Crosse Tribune*, 117 Wis. 2d 448, 454-55, 344 N.W.2d 536 (Ct. App. 1984)). Here, Section 4.a. obligated the plaintiffs to "exclusively represent only those companies which are parties to" their Agreement. (Ex. 1126 § 4.a.) Additionally, the plaintiffs each agreed to direct their "efforts toward advancing the interests and business of the Company to the best of [their] ability," and "to refrain from any practices competitive with or prejudicial to the Company." (Ex. 1126 § 4.i.)

The same conduct that led to the plaintiffs' breach of their covenants not to compete as well as to the breach of Endorsement 10 leads me to find that they also engaged in "practices competitive with or prejudicial to" American Family and that they did not "exclusively represent" the companies that were party to their Agent Agreements. An employee that is an agent for his or her employer "owes the employer a duty to act solely for the benefit of the employer during the term of employment; an employee breaches that duty by secretly engaging in competition with the employer during the employment term." *Sokolowski*, 2005 WI App 28, ¶ 39. This is precisely the kind of conduct that the plaintiffs engaged in here. In acting in their capacity as presidents of their new agency corporations, they sent letters to their soon-to-be former American Family insureds telling them that they could offer better rates, products, and services, and they transferred information on

those same soon-to-be former American Family insureds into their FSC Databases.[5]  Thus, the

plaintiffs breached their respective duties of loyalty to American Family.

4.  Section 6.u.: Liquidated Damages Clause or Penalty

A finding that the plaintiffs breached their American Family contracts leads to the next

question to be answered: what is the damage remedy for such breach?  That is to say, is Section 6.u.

of the Agent Agreement enforceable as a reasonable stipulated damages provision or, in the

alternative, is it an unenforceable penalty provision?

The overall single test of validity of a stipulated damages clause is "whether the clause is

reasonable under the totality of circumstances."  *Wassenaar v. Panos*, 111 Wis. 2d 518, 526, 331

N.W.2d 357, 361 (1983).  Several factors that can be applied to help determine whether a particular

clause is reasonable are

> (1) Did the parties intend to provide for damages or for a penalty?  (2) Is the injury
> caused by the breach one that is difficult or incapable of accurate estimation at the
> time of the contract?  (3) Are the stipulated damages a reasonable forecast of the harm
> caused by the breach?

*Id.* at 529-30.

With respect to the first factor, the Wisconsin Supreme Court stated that "[t]he label the

parties apply to the clause, which might indicate their intent, has some evidentiary value, but it is not

conclusive."  *Id.* at 530.

_____

[5]  The plaintiffs "becoming presidents of Competitor Corporations months before [leaving] American Family" and "creating a database for their new Competitor Corporations," (Defs.' Post-Tr. Br. 41), does not in and of itself result in a breach of their duty of loyalty.  The plaintiffs were not prohibited from exploring and seeking other business opportunities before terminating their employment with American Family.  This is common practice.  Although they became presidents of "competing corporations," and set up new databases for storing client information, these actions do not rise to the level of "secretly engaging in competition" with American Family.  Had the plaintiffs decided to remain agents of American Family after taking such actions, the mere existence of another insurance agency, without more, would have posed no competition to American Family.

22

Turning to the second factor, the court stated the following:

> The second factor, sometimes referred to as the "difficulty of ascertainment" test, is generally viewed as helpful in assessing the reasonableness of the clause. The greater the difficulty of estimating or proving damages, the more likely the stipulated damages will appear reasonable. If damages are readily ascertainable, a significant deviation between the stipulated amount and the ascertainable amount will appear unreasonable. The "difficulty of ascertainment" test has several facets, depending on whether the stipulated damages clause is viewed from the perspective of the time of contracting or the time of breach (or trial). These facets include the difficulty of producing proof of damages at trial; the difficulty of determining what damages the breach caused; the difficulty of ascertaining what damages the parties contemplated when they contracted; the absence of a standardized measure of damages for the breach; and the difficulty of forecasting, when the contract is made, all the possible damages which may be caused or occasioned by the various possible breaches.

*Id.* at 530-31 (citations omitted).

With respect to the third factor, the court stated as follows:

> The third factor concerns whether the stipulated damages provision is a reasonable forecast of compensatory damages. Courts test the reasonableness of the parties' forecast, as they test the "difficulty of ascertainment" by looking at the stipulated damages clause from the perspective of both the time of contracting and the time of the breach (or trial).

*Id.* at 531.

The court further stated that

> [t]he second and third factors are intertwined, and both use a combined prospective-retrospective approach. Although courts have frequently said that the reasonableness of the stipulated damages clause must be judged as of the time contract formation (the prospective approach) and that the amount or existence of actual loss at the time of breach or trial is irrelevant, except as evidence helpful in determining what was reasonable at the time of contracting (the retrospective approach), the cases demonstrate that the facts available at trial significantly affect the courts' determination of the reasonableness of the stipulated damages clause. If the damages provided for in the contract are grossly disproportionate to the actual harm sustained, the courts usually conclude that the parties' original expectations were unreasonable. Our prior decisions indicate that this court has employed the prospective-retrospective approach in determining the reasonableness of the stipulated damages clauses and has looked at the harm anticipated at the time of contract formation and the actual harm at the time of the breach (or trial).

*Id.* at 531-32 (citation omitted).

Furthermore, the court stated that

[i]n ruling on the reasonableness of a stipulated damages clause, the trial judge should take into account not only these factors but also the policies that gave rise to the adoption of the reasonableness test as the test for distinguishing between enforceable liquidated damages provisions and unenforceable penalty provisions.

*Id.* at 533.

Finally, the court stated that the person who is challenging the bargained-for contractual provision has "the burden of proving facts which would justify the trial court's concluding that the clause should not be enforced." *Id.* at 526 (citing *Northwestern Motor Car, Inc. v. Pope*, 51 Wis. 2d 292, 295, 182 N.W.2d 200 (1971)).

Bearing all this in mind, the court will now turn to addressing the question of whether Section 6.u. of the Agent Agreement is an enforceable stipulated damages contractual provision, or in the alternative and as the plaintiffs claim (and on which they have the burden of proof), it is an unenforceable penalty provision.

The first factor is the parties' intent, i.e., did they intend to provide for damages or for penalty? For their part, the plaintiffs make much of the fact that the word used in the clause to describe the consequences that will befall a breaching agent is to "forfeit" his or her extended earnings. Indeed, citing *Equity Enterprises, Inc. v. Milosch*, 2001 WI App 186, 247 Wis. 2d 172, 633 N.W.2d 662, the plaintiffs argue that American Family's use of the word "forfeit" in the Agent Agreement means that Section 6.u. was intended to be a penalty clause.

In *Milsoch*, the court held that the two particular non-compete clauses being examined in that case were not enforceable because they were unreasonable. In reaching that conclusion the court applied the factors set forth in *Wassenaar*.

24

One of the provisions of the non-compete clauses that were being examined in *Milosch* dealt with the consequences to be imposed on a breaching party who was owed commissions. The particular section read as follows:

> <u>Commissions After Other Termination</u>. Upon termination of employment by either party for any reason other than those specified in Paragraph 4.1, above, Employee shall be entitled only to commissions accrued to the date of the termination and shall not be entitled to any subsequently accruing commissions on policies. Upon termination of employment by reason of the Employee's commission of a prohibited act (as defined in Paragraph 3.1, above), or if subsequent to termination Employee violates any of the provisions hereof, Employee shall *forfeit* any and all right to further commissions otherwise payable hereunder.

2001 WI App 186, ¶ 7(emphasis added).

Applying the first of the *Wassenaar* factors, i.e., the intent of the parties, the court said:

> In determining whether a particular clause is reasonable, the first factor - whether the parties intend to provide for damages or for a penalty - is only slightly helpful because the subjective intent of the parties has little bearing on whether the clause is objectively reasonable. In short, the label the parties apply to the clause, which might indicate their intent, does have some evidentiary value, but it is not conclusive. We agree with Milosch that the plain language of the contract at issue here implies a penalty rather than a liquidated damage. The parties did not use either the term "damages" or "liquidated damages." Rather, the parties used the term "forfeit" to describe the consequences of a postemployment breach of contract. Although not conclusive, we can infer that the intent of the parties was that the forfeiture would constitute a penalty and was intended to punish an employee who violated any provision of the contract subsequent to termination of the contract.

2001 WI App 186, ¶ 22 (citations omitted).

Latching on to such language, the plaintiffs in the case at bar argue that the "conclusion reached by the *Milosch* court must necessarily be found in this case: The intent of section 6.u. was to impose a penalty." (Pls.' Post-Tr. Br. 16.)

In my opinion, the plaintiffs make a bit too much of the *Milosch* decision on this issue. First of all, the court's decision in *Milosch* was predicated, not just on this particular *Wassenaar* factor, but on the other factors as well. Even more importantly, in *Milosch*, "[n]o extrinsic evidence was

introduced to show the intent of the parties to the contract." 2001 WI App 186, ¶ 11. That was not so in the case at bar.

In the instant case, there was testimony concerning the purpose of the extended earnings (which were to be forfeited in the case of contractual breach). The extended earnings were to provide money to agents when they retired or left the company because American Family agents were not allowed to sell their agencies when they did so. Indeed, plaintiff Jarosch testified that American Family paid him for his agency when he moved from Minnesota to Arizona and had to start a new American Family agency. Jarosch testified that he understood extended earnings were a way to compensate him for selling his agency back to American Family when he left the company.

Furthermore, that something may be "forfeited" does not necessarily mean that the loss occasioned by such forfeiture is to be considered a "penalty" for the commission of a wrongful act. The definition of "forfeit" includes "something which is lost or the right to which is alienated by a crime, offense, neglect of duty, or breach of contract." Webster's Third New International Dictionary of the English Language 891 (1993). Thus, by way of example, a grocer could "forfeit" the right to a load of bananas by not paying the freight costs up-front if the contract called for such up-front payment. But, that does mean that the grocer is being penalized for his failure to pay. It just means that he no longer has the right to receive the bananas.

The point is that the word "forfeit" in the Agent Agreement is not determinative on the question of whether Section 6.u. is enforceable. It is only one factor in the analysis, and a relatively non-helpful one at that, given the testimony in this case.

The second *Wassenaar* factor is whether the injury caused by the breach is one that is difficult or incapable of accurate estimation at the time of the contract. "The greater the difficulty of estimating or proving damages, the more likely the stipulated damages will appear reasonable."

26

*Wassenaar*, 111 Wis. 2d at 530-31 (citing *Sheffield-King Milling Co. v. Jacobs*, 170 Wis. 389, 402-03, 175 N.W. 796 (1920)).  And to reiterate, the various facets that make up the "difficulty of ascertainment" test include the difficulty of producing proof of damages at trial; the difficulty of determining what damages the breach caused; the difficulty of ascertaining what damages the parties contemplated when they contracted; the absence of a standardized measure of damages for the breach; and the difficulty of forecasting, when the contract is made, all the possible damages which may be caused or occasioned by the various possible breaches. *Id.* at 363-64.

The third factor concerns whether the stipulated damages provision is a reasonable forecast of compensatory damages.  But, and as previously noted, the second and third factors are intertwined.  The factors at trial affect the court's determination of the reasonableness of the stipulated damages clause.  If the damages provided for in the contract are grossly disproportionate to the actual harm sustained, the courts usually conclude that the parties' original expectations were unreasonable.  In other words, how matters actually play out (as opposed to baseless conjecture or speculation) goes a long way to helping decide whether the stipulated damages clause as agreed to is reasonable and therefore enforceable.

To begin, there was no testimony about what damages the parties contemplated when they executed the Agent Agreement.  Thus, this particular factor would seem to have little relevance.  The same could be said of the last factor, i.e., the difficulty of forecasting all the possible damages that may be caused or occasioned by the various possible breaches.  Once again, there was no testimony about what the parties considered or contemplated as being possible damages at the time of contracting so it follows that there was no effort by the parties to project what damages might in the future flow from particular breaches.

The other facets of the test seem to be more relevant to the analysis. First, with respect to the difficulty of proving damages at trial, both parties presented expert testimony at trial on the question of damages. To be sure, they did not agree on the appropriate analytical method to be used in coming up with the damage amount; nor, not surprisingly, did they agree on the amount of damages actually sustained by the defendants as a result of a breach of the Agent Agreement. They did, however, each express an opinion on how much financial loss the defendants sustained.

Indeed, the plaintiffs argue that the very fact the defendants themselves did present a damages expert leads to the inescapable conclusion that damages can be proven without much difficulty, thereby negating this particular facet of the test. I do not necessarily agree. In my opinion, the fact that both attempted to determine the amount of damages sustained as a result of a breach of the Agent Agreement is not determinative on this facet of the test. To the contrary, the more disparity there is between the two opinions, the more such might suggest a greater degree of difficulty in trying to prove actual damages caused by the breach.

Furthermore, and as discussed above, this court has not found that the plaintiffs breached their respective Agent Agreements by actually inducing "any policyholder of [American Family] credited to [their] account at the time of termination to lapse, cancel, replace or surrender any insurance policy in force with [American Family]." (Ex. 1126). There has been a failure of proof on that issue. Rather, the court has found that the plaintiffs each breached their respective Agent Agreements by, inter alia, *attempting* to induce such policyholders to "lapse, cancel, replace or surrender any insurance policy in force with [American Family]." (Ex. 1126.)

No expert presented any analysis on the damages caused by such a limited breach. Indeed, attempting to prove what damages would be caused by such a breach might prove nearly impossible. After all, how could one reasonably identify the amount of business American Family lost solely as

28

a consequence of the plaintiffs' *attempts to induce* the policyholders to cancel their policies with American Family and replace them with policies of another company? It would be pure speculation to attempt to do so. The same can be said of the plaintiffs' breach of other provisions of their respective Agent Agreements—it would be pure speculation to identify the amount of business lost solely as a result of the plaintiffs' breach of Endorsement 10 or of their breach of Section 4.a. and 4.i.

These facets of the "difficulty of ascertainment" factor appear to be readily applicable to the facts in this case. Once again, the second *Wassenaar* factor is the "difficulty of ascertainment" test: whether the injury caused by the breach is one that is difficult or incapable of accurate estimation at the time of the contract. "The greater the difficulty of estimating or proving damages, the more likely the stipulated damages will appear reasonable." 111 Wis. 2d at 530-31. Given the virtual impossibility of proving damages caused by any "attempt to induce" in violation of the Agent Agreement, it follows that application of the second *Wassenaar* factor, i.e., the "difficulty of ascertainment" factor, weighs in favor of finding Section 6.u. to be an enforceable stipulated damages clause.

This then takes me to the third factor: whether the stipulated damages provision is a reasonable forecast of compensatory damages. Application of this factor is nettlesome. To determine whether the damages provided for in the contract are grossly disproportionate to the actual harm sustained, I must first determine the amount of actual harm American Family, in fact, sustained. However, as previously discussed, the parties' damage calculations differ drastically.

In this particular case, Clifford and Stingl render different damage calculations. As one might surmise, one calculation (Clifford's) is greater than the termination commissions due to each agent, while the other calculation (Stingl's) is well below the termination commissions due to each

agent. In the case of American Family, it uses Clifford's higher estimate to argue that because it is higher than the termination commissions due each plaintiff, Section 6.u. is a reasonable forecast of compensatory damages and is therefore a stipulated damages provision. Stingl's damage calculation, which is well below what each agent claims as termination commissions, triggers the plaintiffs to argue that Section 6.u. is an unreasonable forecast of compensatory damages and is therefore an unenforceable penalty.

The numbers break down as follows. Termination commissions have been calculated at $216,926.03 for Jarosch; $263,138.26 for Swanigan; $256,901.12 for Vanyo; and $213,050.45 for Donnelly. (Exs. 18, 21, 25, 29.)

Clifford opined to a reasonable degree of certainty that the lost profits American Family incurred (before prejudgment interest) as a result of the agents' conduct were as follows: $339,254.00 for Jarosch; $308,644.00 for Swanigan; $265,076.00 for Vanyo; and $286,795.00 for Donnelly. (Exs. 1387, 1388, 1390.)

Stingl provides three damage calculations for each agent. First, using the attrition rate and agency operating profit from each of the plaintiff's Agent Operating Report, Stingl opined to a reasonable degree of certainty that the lost profits American Family incurred as a result of the agents' conduct were as follows: $60,841.38 for Jarosch; $46,550.28 for Swanigan; $54,918.07 for Vanyo; and $62,279.11 for Donnelly. (Ex. 50.) Second, using the State of Arizona's average retention rate of 20% and average profit of 11%,[6] Stingl opined to a reasonable degree of certainty that the lost profits American Family incurred as a result of the agents' conduct were as follows: $36,523.76 for Jarosch; $43,055.09 for Swanigan; $79,718.88 for Vanyo; and $77,681.93 for Donnelly. (Ex. 50.)

---

[6] The average profit rate of 11% was the average of each of the five (including David Duggan) agents' profit percentages, which ranged from 7% to 17%.

Third, using the company-wide attrition rate of 30%[7] and average profit of 11%, Stingl opined to a reasonable degree of certainty that the lost profits American Family incurred as a result of the agents' conduct were as follows: $31,958.29 for Jarosch; $38,106.33 for Swanigan; $69,754.02 for Vanyo; and $67,971.69 for Donnelly. (Ex. 63, Tabs 3-6.)

Although Clifford's and Stingl's damage calculations are disparate, there is some appeal to both estimates. On the one hand, Clifford includes damages beyond the one-year covenant not to compete period in his damage calculation. The *assumption* Clifford makes, i.e., that each policy American Family lost because of the agents' conduct results in lost profits experienced over a period of time in excess of the one year time period after the agents' termination date, may be a reasonable one to make. On the other hand, Stingl limits her damage calculation to only the first year following termination of the agents' contracts. The *assumption* Stingl makes, i.e., that the agents would have induced their former American Family policyholders to terminate their policies upon the conclusion of their one year covenant not to compete, may also be a reasonable one to make.

However, Clifford and Stingl both take their assumptions to the extreme. American Family does not account for the likelihood that the plaintiffs, had they not breached their one-year covenant not to compete, would nevertheless have solicited their former American Family policyholders after the one year time limitation expired. Conversely, the plaintiffs do not account for the likelihood that, had they not breached their one-year covenant not to compete, not as many of their former American Family policyholders would have re-written insurance with the plaintiffs' new agencies.

---

[7] This company wide attrition rate for transferred policies was memorialized in a memorandum from American Family dated October 21, 2010 that did not surface until after trial. (Ex. 63, Tab 1.) This realization led to the court's reopening of the case to allow Stingl to provide supplemental testimony on March 7, 2011.

Were each factor of the reasonableness determination a separate test, it might be necessary to determine which damage calculation more accurately reflects the actual harm that American Family sustained. However, determining the validity of a stipulated damages clause is not a divide-and-conquer analysis. As the Wisconsin Supreme Court stated, "the various factors and approaches to determine reasonableness are not separate tests, each of which must be satisfied for a stipulated damages clause to stand. Reasonableness of the stipulated damages clause cannot be determined by a mechanical application of the three factors cited above." *Wassenaar*, 111 Wis. 2d at 533. Accordingly, the difficulty in determining actual damages American Family sustained *after* the breach of contract lends credence to the proposition that actual damages sustained would have been difficult to accurately estimate *at the time* of the contract.

Such conclusion hearkens back to my earlier finding that proving damages caused by the plaintiffs' actual breach is nearly impossible. Stingl stated that the damages flowing from the breach of contract can be calculated with reasonableness and certainty, (8/27/10 Tr. 100), and that the differences between her estimate of lost profits and Clifford's estimate of lost profits "really lie upon the underlying assumptions in developing the calculations in the methodology," (8/27/10 Tr. 103). However, to say that the difference in the expert opinions lies not with the methodology, but with the assumptions that had to be made to employ the methodology, is a distinction without a difference. The various assumptions that had to be made to calculate lost profits in this case highlight the purely speculative nature of the task of estimating actual damages. Relying on different assumptions, Clifford and Stingl came up with widely disparate numbers that lead to the inescapable conclusion, not that their methodology was unsound, but that damages were difficult to estimate at the time of contract.

The foregoing leads me to find the stipulated damages clause reasonable and enforceable. First, there was evidence indicating that the parties intended to provide for damages, and the term "forfeit" does not necessarily equate to penalty. Second, the injury caused by the plaintiffs' breach was difficult or incapable of accurate estimation at the time of contract. Even after a finding of breach by the plaintiffs has been made, it is extremely difficult to put a numerical tag on American Family's lost profits. So, how could the parties have reasonably ascertained damages at the time of contracting, especially given that a breach of *any* contract provision triggers application of the stipulated damages clause?

Given the foregoing analysis, I find that the plaintiffs are not entitled to termination commissions. To the extent that the plaintiffs have already received a portion of those termination commissions, they will be ordered to return those amounts to American Family. Specifically, American Family is entitled to recover $14,203.36 from Donnelly, (Tr. 378:7-16, Ex. 18); $8,563.38 from Vanyo, (Tr. 473:1-2, Ex. 29); $48,242.40 from Swanigan, (Tr. 232:14-18, Ex. 21); and $6,025.83 from Jarosch, (Tr. 185:15-24, Ex. 25).

**B. American Family's Claim Against Third Party Defendants: Aiding and Abetting Breach of Contract and Tortious Interference**

American Family has asserted two contract claims against the third party defendants, Jarosch Insurance Agency, Inc., Vanyo Insurance Group, Inc., Donnelly Insurance Group, Inc., Gary Swanigan Insurance Agency, Inc., and CIA. First, American Family alleges that the third party defendants aided and abetted the plaintiffs' breach of their respective contracts with American Family. Second, American Family alleges that the third party defendants tortiously interfered with the plaintiffs' and American Family's contract.

## 1. Aiding and Abetting Breach of Contract

As the plaintiffs point out, the case relied upon by American Family for identifying the elements that are to govern a claim for aiding and abetting, *Winslow v. Brown*, 125 Wis. 2d 327, 371 N.W.2d 417 (Ct. App. 1985), applies to claims for aiding and abetting a *negligent* act. American Family does not cite any Wisconsin case recognizing a cause of action for aiding and abetting a breach of contract. Nor has this court's independent research uncovered any case law supporting the existence of such a cause of action. In fact, the Restatement (Second) Law of Torts § 876(b) (1979), relied upon by the court in *Winslow*, provides that one is subject to liability for the "harm resulting to a third person from the tortious conduct," if one "gives substantial assistance to the other in accomplishing a tortious result." Because a breach of contract is not a tortious act, § 876 does not support American Family's aiding and abetting breach of contract claim. Therefore, American Family's claim against the third party defendants for aiding and abetting the plaintiffs' breach of contract fails.[8]

---

[8] According to American Family, if a duty of loyalty exists, and a third party encourages and profits from a breach of the duty of loyalty, a claim for aiding and abetting the breach will lie. (Defs.' Post-Tr. Br. 40 (citing *Burbank Grease*, 2006 WI 103, ¶ 43).) However, because American Family's claim against the plaintiffs for breach of their duty of loyalty sounds in contract, its claim against the third party defendants for aiding and abetting such breach will be more pointedly addressed as part of American Family's claim for tortious interference.

34

2.  Tortious Interference[9]

A Wisconsin tortious interference cause of action has five elements: (1) the plaintiff must have had a contract or a prospective contractual relationship with a third party; (2) the defendant must have interfered with that relationship; (3) the interference by the defendant must have been intentional; (4) there must be a causal connection between the interference and damages; and (5) the defendant must not have been justified or privileged to interfere. *See Briesemeister v. Lehner*, 2006 WI App 140, ¶ 48, 295 Wis. 2d 429, 720 N.W.2d 531; *see also Duct-O-Wire Co. v. U.S. Crane, Inc.*, 31 F.3d 506, 509 (7th Cir. 1994) (applying Wisconsin law).   The first element of a tortious interference claim has been satisfied—each of the plaintiffs had a contract with American Family at the time they terminated their relationship with American Family.

American Family leaves the court speculating as to which contractual provisions CIA and the plaintiffs' competitor corporations allegedly tortiously interfered with.   As I see it, however, American Family's claim for tortious interference parallels its claims asserted against the plaintiffs for breach of contract.   Specifically, the inquiry is whether the plaintiffs' competitor corporations or CIA tortiously interfered with the following contractual provisions: the plaintiffs' non-compete

---

⁹    The plaintiffs generally argue that Arizona law, not Wisconsin law, should apply to American Family's tortious interference claim.   However, the plaintiffs make no attempt to demonstrate why Arizona law should apply by performing a choice of law analysis, nor do they show why it makes a difference.   Under Arizona law, a plaintiff must show the following to prove the tort of intentional interference with contractual relations:

> the existence of a valid contractual relationship or business expectancy; the interferer's knowledge of the relationship or expectancy; intentional interference inducing or causing a breach or termination of the relationship or expectancy; and resultant damage to the party whose relationship or expectancy has been disrupted. . . . In addition, the interference must be improper as to motive or means before liability will attach.

*Neonatology Assocs., Ltd. v. Phoenix Perinatal Assocs. Inc.*, 164 P.3d 691, 693 (Ariz. Ct. App. 2007) (quoting *Wallace v. Casa Grande Union High Sch. Dist. No. 82 Bd. of Governors*, 184 Ariz. 419, 427, 909 P.2d 486, 494 (App. 1995)).   The plaintiffs' argument is substantially under-developed, and I will proceed to analyze American Family's tortious interference claim under Wisconsin law.

agreements, Section 4.a. and 4.i. (which relate to the plaintiffs' exclusive representation of and loyalty to American Family), and Endorsement 10.

I will first analyze American Family's claim for tortious interference against the plaintiffs' competitor corporations. Acting in a presidential capacity for their new insurance agency corporations, the plaintiffs sent letters to each of their American Family policyholders, which, as previously discussed, formed the basis for the court's conclusion that the plaintiffs violated the non-compete provision of their Agent Agreements. Each of the plaintiffs' letters were sent on letterhead bearing the imprimatur of their new independent insurance agencies. Those letters constituted an attempt to induce the plaintiffs' American Family policyholders to do business with the plaintiffs' new agencies, thereby interfering with the plaintiffs' non-compete agreement with American Family as well as their duties of loyalty owed to American Family. The plaintiffs were also acting in their presidential capacity for their new insurance agencies when they breached Endorsement 10, thereby causing their competitor corporations to meddle with the contractual relationship set forth therein. Therefore, the plaintiffs' competitor corporations interfered with the plaintiffs' contractual relationships with American Family.

The plaintiffs' competitor corporations' interference was also intentional. Most, if not all of the plaintiffs testified that they intended to at least try to re-write the business of their former American Family policyholders because they worked hard to obtain those customers, and because they believed the information they input from the file folders into their FSC Databases was their information to so take. (Jarosch stating that the quote sheets he used to write down policyholder information "was [his] information," Tr. 204:18-23; Swanigan stating, "[w]ell, I had worked to solicit that business. I had -- I looked at it as kind of like my work product from the efforts I put forth to get that. Once it was in the computer system, you know, that's theirs," Tr. 222:6-9; Vanyo, in

referring to taking information from the ADS System on prospective customers, stating that "those are leads that I paid for and I paid an employee to work and solicit and try and nurture business. And in that mind that was my information," Tr. 470:7-9.) Thus, the plaintiffs, acting on behalf of their competitor corporations, knew precisely what they were doing by transferring such information to their new databases and by sending letters to all of their American Family insureds. The evidence does not warrant any other conclusion.

This brings me to the fourth element: whether a causal connection between the interference and damages exists. To prove causation, a plaintiff must prove that a defendant's actions are a "substantial factor" in producing the harm to the plaintiff. *Wolnak v. Cardiovascular & Thoracic Surgeons of Central Wis.*, 2005 WI App 217, ¶ 15, 287 Wis. 2d 560, 706 N.W.2d 667. The evidence American Family presented at trial was that after the plaintiffs sent letters to their American Family insureds informing them of their new insurance agencies, American Family insureds who were credited to the plaintiffs' accounts cancelled policies in droves. While the plaintiffs agree that they re-wrote policies for many of their American Family customers, the record in this case does not reflect why these American Family policyholders cancelled their American Family insurance. Indeed, perhaps the plaintiffs convinced them to cancel their American Family insurance policies. On the other hand, maybe these policyholders were on the verge of cancelling their American Family policies anyway, in light of the testimony about the dissatisfaction of many American Family policyholders. Maybe the plaintiffs' competitor corporations simply offered better rates and services, requiring no effort whatsoever on the part of the plaintiffs' new corporations. It could have been that these policyholders simply wanted to remain with their particular agent out of loyalty, regardless of any action on the competitor corporations' part. (*See* Ex. 1253 at 123 (Wanda Swanigan reporting that a Tranlog report reflected that an insured called the new agency requesting to "speak to Gary

37

because she has a good rapport with him and would prefer to stay with the agency, company does not matter.").) Rather than presenting any evidence regarding the reasons for their policyholders switching insurance carriers, American Family relies on speculation in trying to prove the reasons for such action.

No expert presented any analysis of the damages caused solely by the plaintiffs' competitor corporations' interference with the plaintiffs' contractual obligations to American Family. I hinted previously that identifying the amount of business American Family lost solely as a consequence of the plaintiffs' breach of their respective contracts might prove nearly impossible. The same goes for identifying the amount of business American Family lost solely as a consequence of one's interference with another's obligation to refrain from attempting to induce policyholders to cancel their policies and to refrain from using and/or disclosing confidential and proprietary information. Indeed, proving the amount of lost profits caused by such interference proves even more difficult. Any attempt to do this would involve nothing but speculation.

In light of the foregoing, how can one say that the plaintiffs' competitor companies' actions were a substantial factor in causing American Family's damages when we have no idea why these policyholders cancelled their insurance with American Family? Thus, American Family has not proven the third element of the tortious interference cause of action. Because American Family has not met its burden of proving causation, analyzing whether the plaintiffs' competitor corporations' interference was justified or privileged is not necessary.

Moving on to American Family's claim for tortious interference against CIA, American Family describes a litany of ways in which CIA tortiously interfered with the plaintiffs' contracts with American Family. American Family contends that Couri himself met with the plaintiffs and encouraged them to join CIA. After getting the plaintiffs on board, Couri helped in establishing

agency shell corporations months before the plaintiffs joined CIA and while they were still working for American Family. Furthermore, CIA paid the expenses associated with the various corporate filings, including the drafting and filing of the Articles of Incorporation and applying for employer identification numbers; it also assisted the agents in establishing contractual relationships with the new independent insurance companies. Additionally, CIA provided to the plaintiffs the FSC contract before they left American Family as well as sample resignation letters and the "I was not solicited" form given to each former American Family insured upon re-writing insurance with the plaintiffs' new insurance agencies. CIA knew that the plaintiffs were sending letters to their insureds announcing their new businesses, and, at least in the case of Vanyo, Randy Apel, a CIA representative, asked to see a draft of the letter. CIA assisted the plaintiffs by providing instructions on quoting of insurance policies and other practices prior to their termination from American Family. American Family theorizes about how CIA targets captive agents in developing its business. And in showing the repetitive nature of CIA's involvement in setting up new independent insurance agencies for the plaintiffs, American Family argues that CIA's interference is "systematic[] and purposeful[]." (Defs.' Post-Tr. Br. 38.)

Simply recruiting agents to join CIA, setting up new corporations, filing corporate documents, and training new employees in quoting insurance does not constitute tortious interference with the plaintiffs' contractual obligations to American Family. Nothing in the Agent Agreement prohibits the plaintiffs from exploring or considering other business opportunities before terminating their contracts with American Family. The record reflects that each of the plaintiffs fully serviced their American Family policyholders until their termination with the company. The plaintiffs continued to place all insurance business with American Family until they terminated their agreement with American Family. And, in fact, while CIA took great steps in preparing the plaintiffs for operating

their independent insurance agencies, the Placement Agreements with CIA provided that they did not become effective unless and until the plaintiffs terminated employment with American Family. (Ex. 10 at 10.)

Furthermore, American Family has failed to present any evidence that CIA encouraged the plaintiffs to send letter to their soon-to-be former American Family policyholders notifying them of their new business ventures. Nor is there any evidence demonstrating that CIA representatives expected the plaintiffs to transfer their American Family book of business to their new agencies *before* terminating employment with American Family.

To the contrary, the record clearly establishes that Couri, both in writing and verbally, instructed the plaintiffs that he expected them to comply with all contractual provisions as set forth in their respective agreements with American Family. At the time each plaintiff and CIA formed the various agency corporations, CIA provided them each a letter to this effect. This letter, which was read to each plaintiff at closing, reads as follows:

> Presently, you are under contract with American Family Insurance. Your contract with American Family Insurance sets forth certain obligations during the term of your contract and thereafter. CIA [Couri Insurance Associates] expects and requires that you comply with, and honor, the terms of your contract during your affiliation with American Family Insurance and thereafter.
>
> To be clear, you shall not sell or solicit insurance products other than those of American Family Insurance, and you shall not place or direct accounts with anyone who wishes to purchase insurance to an insurance company other than American Family Insurance prior to the effective date of your resignation. However, prior to the effective date of your resignation, we will work with you to obtain E&O coverage and to train you on how to conduct business as an independent agent . . . .

(Ex. 1041.) Moreover, Donnelly testified that Couri told him at closing that he was to honor his contract with American Family before going live with his new agency. (Tr. 402-03.) Vanyo testified that Couri told him at closing that Couri expected him to honor his contract with American Family until he terminated his contract with American Family. (Tr. 464.) Swanigan testified that although

Couri encouraged him to keep his data in Fiserve, nobody from CIA encouraged him to enter data into Fiserve before going live with his new agency. (Tr. 292-93.) In fact, Couri told Swanigan at closing not to put information into Fiserve or use such information prior to going live. (Tr. 294.) Therefore, it is clear that the expectation from Couri was that the plaintiffs would fulfill their contractual obligations to American Family until termination.

On the other hand, evidence in the record indicates that other CIA representatives knew about the plaintiffs' transferring of client data into their FSC Databases. For instance, a memorandum from someone employed by CIA documented their work with Donnelly on June 5, 6, and 8, 2006, indicating that Donnelly "did not have as much information entered as we had hoped so they [Donnelly's agency] were gathering data from clients to enter." (Ex. 1009.) Furthermore, in a memorandum prepared by Steve Woodworth for the week of May 8, 2006, Woodworth indicates that Vanyo was going to be using his back office the following week to enter data in "MI Management." (Ex. 1165.) Contrary to American Family's contention, these two memoranda do not demonstrate interference by CIA; they only demonstrate that CIA representatives *hoped* Donnelly was entering American Family policyholder information into his FSC Database, and that Woodworth was *aware* that Vanyo was going to enter data in his FSC Database in the near future. Stated differently, these two memoranda do not show action, much less interference, on CIA's end.

The closest American Family gets to proving that CIA interfered with the plaintiffs' contracts with American Family is suggesting that CIA interfered with Endorsement 10. Donnelly testified that Apel encouraged him to get all of the information he could into Fiserve. According to Donnelly, Apel told him that getting names and addresses were important, and that driver's license numbers would also be helpful. (Tr. 423.) Encouraging Donnelly to take American Family customer information comes much closer to demonstrating interference with Endorsement 10.

However, even if CIA interfered with Endorsement 10, American Family has failed to prove that such interference was intentional. There is no evidence in the record from which to conclude that Couri, or anybody within CIA, knew about the existence of Endorsement 10. Couri testified that no one from American Family notified CIA "that American Family believed it had some contract arrangements with its agent that established this confidential or propriety information relationship." (Tr. 37.) Therefore, even if CIA did interfere with the plaintiffs duties set forth in Endorsement 10, any interference could not be deemed intentional in the absence of knowledge of its very existence.

Additionally, American Family has not shown how its harm was causally connected to any interference on CIA's part. For the same reasons that American Family failed to prove that the plaintiffs' competitor companies' actions were a substantial factor in producing harm to American Family, American Family did not prove that CIA's actions were a substantial factor in producing the harm it suffered. American Family attributes its injuries to the plaintiffs and third party defendants, not by demonstrating that its former policyholders, or even a representative sample of its former policyholders, cancelled their American Family policies because of any interference by CIA, but rather by relying on mere speculation.

Thus, American Family has not proven its tortious interference with contract claims.

### C. Misappropriation of Trade Secrets

American Family contends that the plaintiffs misappropriated American Family's trade secrets, to wit, the contents of the ADS System. American Family also asserts a claim against the third party defendants for aiding and abetting the plaintiffs' misappropriation of trade secrets.

Wisconsin's statute governing misappropriation of trade secrets, Wis. Stat. § 134.90, defines misappropriation as follows:

> (2) Misappropriation. No person, including the state, may misappropriate or threaten to misappropriate a trade secret by doing any of the following:

(a) Acquiring the trade secret of another by means which the person knows or has reason to know constitute improper means.

(b) Disclosing or using without express or implied consent a trade secret of another if the person did any of the following:

>1. Used improper means to acquire knowledge of the trade secret.

>2. At the time of disclosure or use, know or had reason to know that he or she obtained knowledge of the trade secret through any of the following means:

>>a. Deriving it from or through a person who utilized improper means to acquire it.

>>b. Acquiring it under circumstances giving rise to a duty to maintain its secrecy or limit its use.

>>c. Deriving it from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use.

>>d. Acquiring by accident or mistake.

Wis. Stat. § 134.90(2) (2009-10).[10]  Moreover, Wisconsin law broadly defines "person" to include a corporation.  Wis. Stat. § 990.01(26).[11]

The plaintiffs deny that they misappropriated American Family's trade secrets because the "policyholder information used to create the database was obtained from the file folders, quote sheets

---

[10]  All references to the Wisconsin Statutes are to the 2009-10 version unless otherwise noted.

[11]  The plaintiffs now contend that American Family's "tort claims are governed by the laws of the State of Arizona, not Wisconsin."  (Pls.' Post Tr. Resp. Br. 6.)  However, the court previously applied Wisconsin law in addressing American Family's trade secrets claim because both Wisconsin and Arizona have adopted the Uniform Trade Secrets Act.  (*See* March 30, 2010 Decision and Order on Cross-Motions for Summary Judgment 11 n.4.)  This was because of Wisconsin's choice of law algorithm.  *See Cerabio LLC v. Wright Med. Tech.*, 410 F.3d 981, 987 (7th Cir. 2005).  Thus, the court will continue to apply Wisconsin law to American Family's trade secrets claim.

43

and other data contained in the hard files." (Pls.' Post Tr. Resp. Br. 28.) The plaintiffs disagree with any allegation that they took any policyholder information from the American Family ADS System.

According to American Family, the plaintiffs' argument "improperly elevates form over substance." (Defs.' Post-Tr. Br. 55.) American Family contends that the following evidence demonstrates that the plaintiffs misappropriated its trade secrets: (1) ADS logs show that the plaintiffs ran queries containing large amounts of policyholder information shortly before their termination date; (2) the plaintiffs' file folders do not match the data contained in Fiserv; (3) the plaintiffs' file folders were often incomplete and/or contained information taken from the ADS System; (4) Vanyo admitted to taking information directly from ADS; (5) Fiserv tables contain massive amounts of former American Family policyholder information; and (6) the plaintiffs did not create file folders for transferred policies. American Family also argues that each of the plaintiffs understood that the information contained within the ADS System was confidential, thereby giving rise to a duty to maintain the secrecy of that information. Moreover, American Family contends that the source from which the plaintiffs took information "makes no difference for purposes of American Family's trade secret claim" because pursuant to Endorsement 10, each of the plaintiffs were contractually obligated to maintain hard-copy records, which became American Family's property. (Defs.' Post-Tr. Br. 55.)

The undisputed evidence from trial reveals the following with respect to each plaintiff:

*Jarosch*

Although Jarosch did not "go live" with his new agency until September 11, 2006, Jarosch established his FSC Database in late July or early August 2006. (Tr. 113-14.) When asked how he prepared to open his new agency, the following exchange occurred:

Q. And what date did you, quote, go live; in other words, begin operations with Jarosch Insurance Agency?

44

A. September 11, 2006.

Q. Advise the court then what occurred between July 25th and September 11th? What events transpired?

A. We bought computers, gathered information as far as policyholders from the files, and started inputting into the machine.

Q. What was the source of the information that was used that was, quote, put into the machine?

A. My file folders.

Q. Your physical folders themselves?

A. Yes.

Q. Anything else?

A. Any materials that were inside of it.

Q. You earlier referenced quote sheets?

A. Yes.

Q. Were those used?

A. Yes.

Q. The -- when you say "put into the machine," what do you mean?

A. Well, I put like names and telephone numbers and addresses into the FSC.

(Tr. 113-14.) Jarosch testified that he used quote sheets so that when he was speaking with a potential client, he could then fill out the information such as "names, addresses, things of that --" on the quote sheet that he "would need to do a rate." (Tr. 95-96:21-22.) When asked whether he would then put the information from the quote sheet into ADS, he replied, "Not always." (Tr. 199:13.) Jarosch believed that the information on the quote sheets was his information, as opposed to being "a hard record that belonged to American Family," particularly because American Family did not provide to him the quote sheets. (Tr. 204-205.)

According to Lorelei Jarosch, she did not always fill out the file folder completely; she only wrote in the name, address, phone number, birth date, as well as spouse name and birth date and children of driving age and birth date. (Ex. 1197 at 32-33.) However, more than merely name, address, phone number, and date of birth were discovered in Jarosch's FSC Database—email address, gender, marital status, identification numbers, effective and expiration date for policies, type of policy, policy limits, and other policy information were also discovered. (Tr. 695:15-697:13, 701:8-702:9.) Lorelei Jarosch also testified to looking up information on ADS and inserting it into the hard copy file if information was missing in the hard copy file. (Ex. 1197 at 33-35.) Any paperwork received from American Family was also inserted into the corresponding client's file. (Ex. 1197 at 29.)

Jarosch further testified that he typed the majority of information into the FSC Database and that he entered some birth dates and some social security numbers; but, he did not enter driver's license or vehicle identification numbers. (Tr. 161-62.) Additionally, Jarosch stated that he "never should have" put all of the American Family data into the FSC database because it "didn't help" him; he used only the "name and address" to "do the mailings." (Tr. 123:10-14.) He further admitted that he understood that American Family expected him as an agent to maintain the confidentiality of customer information. (Tr. 192.)

American Family's records also demonstrate that, on July 24, 2006, Jarosch accessed ADS five times for business policy lists. Jarosch then transferred information from those policy lists to Microsoft Excel on that same day. (Tr. 177-79.)

In mailing the letter dated September 11, 2006 to all former American Family policyholders, Jarosch testified that he used the file folders and information inside the file folders, then he wrote the names and addresses on the envelopes. (Tr. 204.) Jarosch also made contact with his former

46

American Family policyholders upon the expiration of his non-compete covenant. After a period of one year from his termination, Jarosch used his Fiserve database to call former American Family policyholders who had not yet switched insurance carriers, with the purpose being to sell them insurance. (Tr. 180.) Jarosch also sent letters to former American Family policyholders who had not re-written business with him on his one-year termination anniversary from American Family. (Tr. 197; Exs. 1256, 1257.)

*Swanigan*

Although Swanigan did not "go live" with his new agency until March 1, 2006, Swanigan established his FSC Database in December 2005. (Tr. 220-21.) Swanigan also testified that in preparing to open with his new agency, he entered information from his hard files into the FSC Database. (Tr. 221.) Specifically, he testified as follows:

Q. And what happened then from between November 29th, 2005 and March 1st, 2006, as it related to getting the corporation ready to begin operating? What steps physically took place?

A. The corporation or the agency?

Q. The agency.

A. Okay. In December, mid December sometime, I don't remember the exact date, but mid December sometime I bought computers, office equipment, computer equipment, printer, and that sort of thing. And then we began -- myself, my wife, and my CSR, secretary, Kesper Service representative -- was entering information out of the hard files into the FSC system. Mainly, mainly me. I did the majority of the entry.

Q. When you use the phrase "hard files," what do you mean?

A. Hard files is any paper file or anything that would be in or on the file folder. For example, the way I did things, if someone called in for a quote, I would take a note pad or yellow legal pad or something like that and I'd write the information down. I had it memorized as to what the questions I was going to ask them, your name, your date of birth, type of car you drive, all the pertinent information to give them a quote with American Family. So I had all that information in the files.

47

Q. Okay. So, procedurally, and I don't want to have to go through a lot of history, but you would have followed the same procedure that Mr. Jarosch discussed where initially you would take the information down, eventually you'd submit it to American Family through their computer system if the policy was written, but you would keep a hard copy of your notes in the file.

A. Correct.

Q. And then when you elected to go and affiliate with Couri, you replicated that information by putting it into an FSC database.

A. Yes.

(Tr. 220-21.) Contained within the hard files were customer names, addresses, drivers license numbers, type of vehicle, and home descriptions. (Tr. 310.) Some of Swanigan's hard files also contained vehicle change forms, and the information therefrom would also be "sent up to American Family via ADS." (Tr. 313.) When entering information in the FSC Database, both he and Wanda Swanigan also looked at the application, which had been previously sent to American Family via ADS, contained within the file folder. (Tr. 316-17; Ex. 1253 at 91.)

Swanigan also testified that once he entered the information into ADS and quoted a potential client, and the potential client became an insured of American Family, he would open a file on the customer and a declaration sheet (which contained a customer's name, coverage, coverage limits, premium, lienholder information, and identification of the mortgage company on a homeowner's policy) would be either electronically sent or mailed to him. (Tr. 271-72.) Once he received the declaration sheet, it would then go into his hard file folder for each respective policyholder. (Tr. 272.) However, in copying information to the FSC Database, Swanigan testified that he would not refer to the declaration sheet because he did not always receive copies of such documents for every policy. (Tr. 315.)

Just as Jarosch testified, Swanigan believed the information in the file folders was his because he had worked hard to solicit that business, even though he recognized that, once the information was

48

in the ADS System, it belonged to American Family. (Tr. 222.) Swanigan also understood clientele information was confidential. (Tr. 267.) Upon terminating his American Family contract, Swanigan told his staff to leave the hard files in the file cabinets and to not touch them because the district manager would come and retrieve them, which the district manager did one week later. (Tr. 248.)

As previously indicated, Swanigan sent letters to his soon-to-be former American Family policyholders in February 2006. To complete such mailings, Wanda Swanigan testified that the Swanigan agency pulled the names and addresses out of their paper files. (Ex. 1253 at 44-45.) Swanigan testified that his FSC Database was the source of the names and addresses that he used to mail these letters. (Tr. 230-31.) If an insured called him upon starting with his new agency and he was unsure about an insured's renewal date, he sometimes looked to his account statements to find such information. (Tr. 311.)

After his one-year non-compete provision expired, Swanigan also used the FSC Database to send letters to his former American Family policyholders whose business he was unable to transfer and whose policies were coming up for renewal. (Tr. 325.) These policyholders were marked "P" for prospects in the FSC Database. (Tr. 325.)

In the months leading up to Swanigan's termination from American Family, Swanigan ran many ADS queries. In particular, he (or someone working for his agency) made inquiries on January 5, 2006, February 2, 2006, and February 20, 2006, which were exported to another site. Swanigan did not recollect why he made such inquiries, other than to speculate that the inquiries may have been sent to the company that mailed birthday cards to current policyholders. (Tr. 341-43; Ex. 1070.)[12]

--------

[12] While the description for the January query is "Accounts with Members in [Age] Range," the description for the February queries is "All Selected [Auto Policy Type] with Selected [Discount] By ExpDate," and "All Selected [Homeowner Policy Type] with Selected [Opt-End] by ExpDate." (Ex. 1070.)

49

*Donnelly*

Although Donnelly did not "go live" with his new agency until June 5, 2006, Donnelly

established his FSC Database in May 2006. (Tr. 372.) Donnelly testified in much the same fashion

as Jarosch and Swanigan.

> Q. Between the signing of the contracts with Couri at the end of April and the live
> date, just run through the process of what you did to prepare to begin operating your
> independent agency.
>
> A. Sure. It was the end of April when I signed my corporate agreement with Couri.
> My live date was June 5th. . . . [T]hat gave me about a month's worth to procure
> computers. So I purchased two computers. And it was early May I got my FSC
> Management System, if you will, disk and how I could get it set up so I could begin
> to make files on people.
>
> Q. Okay. And did you also create a database of policyholder information using the
> FSC server system?
>
> A. Yes, I did.
>
> Q. What was the source of the information used to create that database?
>
> A. My clientele base that I had with American Family Insurance. Going into the file
> cabinet, pulling the file out, opening it up and taking the names and addresses and
> whatever information I could quickly obtain - VIN numbers if possible, driver's
> licence numbers, dates of birth.
>
> Q. Did you take any information from the ADS database directly, either by exporting
> it out of that database or by customer lists that were printed from that database, and
> use those as a source for information in creating the FSC database?
>
> A. No, I did not.

(Tr. 371-72.) Donnelly further testified that when he transferred information from his files into the

FSC Database he was acting for the benefit of Donnelly Insurance Group. (Tr. 402.) Specifically,

he transferred names, addresses, telephone numbers, kinds of policies, dates of birth, and social

security numbers. (Tr. 413-14.) Donnelly testified that he really did not enter coverages or premium

information into the FSC Database. (Tr. 414.)

50

However, according to Karen Lindberg, who worked for Donnelly, she entered information into the FSC Database from Donnelly's hard copy files, some of which contained applications printed from American Family's ADS System. (Ex. 1199 at 13-15.) Martina Gilbert, another employee of Donnelly's also added ADS printouts (including applications and declaration pages) to the file folder whenever a customer made a change to the policy. (Ex. 1203 at 14-16, 25-26.)

Logs from ADS demonstrate that from June 3, 2005 until October 24, 2005, Donnelly did not access the ADS System one time. However, from March 28, 2006 to May 23, 2006, Donnelly accessed the ADS System 28 times.[13] (Tr. 418-20.) When asked why he ran so many queries, he said that "[i]t must have been a boring day at the office." (Tr. 421.) He also stated that he must have had a district meeting on May 28, 2006 regarding homeowners' valuations. (Tr. 420, 438.) Donnelly further testified that after running the queries and looking at them, he shredded them. (Tr. 422.)

In sending letters to American Family policyholders informing them of his career move, Donnelly used the balance of his American Family return address envelopes. (Tr. 407.) Then, in February 2008, Donnelly sent another letter notifying his active and prospective clients (including former American Family policyholders) that he moved his business. To complete such mailings, he used names and addresses from the FSC Database. (Tr. 427-28; Ex. 1031.)

*Vanyo*

Although Vanyo did not "go live" with his new agency until October 9, 2006, Vanyo established his FSC Database in June 2006. (Tr. 489.) Vanyo, unlike the three other plaintiffs,

---

[13] The descriptions for the ADS queries Donnelly ran include, but are not limited to, the following: "Accounts with Commercial Policies," "Accounts with Auto Only," "Accounts with Only One Line of Insurance," "Accounts without Property," "All Homeowners with Exp Date in [Month] by ExpDate," "All Inactive Homeowners in [ExpDate] Range," "All Selected [Property Policy Type] by ExpDate," "All Term Life with a Death Benefit over 50,000," "Accounts with Selected [Commercial Policy Type] without Health, and Accounts with Umbrella." (Ex. 1070.)

51

admitted to taking information directly from ADS and putting it into his FSC Database. Although, Vanyo stated that he never personally entered American Family policyholder information into the FSC Database, he directed both his wife and a temporary worker, Andrea Miller, to enter such information.[14] According to Vanyo, he stated that "on the active customers, [they] were going to take the information out of the file folder." (Tr. 469.) It was with respect to the information obtained by the temporarily hired solicitor in an attempt to write insurance for more policyholders that Vanyo took information from the ADS System. Specifically, Vanyo testified as follows:

> Q. [Y]ou have testified from day one in this case that you also took information from the ADS database, did you not?
>
> A. Yes, I did.
>
> Q. All right, explain that. What did you take and why did you take it?
>
> A. Well, going back, if you recall that I mentioned I hired the solicitor for that four- or five-month period. And he would enter that information. Of course, he was trying to quote people and whatever, and he would enter that information into the data system, okay? And again, those are leads that I paid for and I paid an employee to work and solicit and try and nurture business. And in that mind that was my information. And it was stored in the ADS system. The only way that I knew to get it off was to take it off the screen, if you will.
>
> Q. Where was -- what was the source of the information that the solicitor used to put into the database?
>
> A. We had -- since day one of my operation, okay, we've always used what's called a quote sheet. And I think a few of the other agents talked about these things. But there was a sheet that name, address, phone number, VIN, type of insurance, coverage amounts. And so as you're soliciting on the phone you're writing down all this type of information.
>
>     And to secure a quote, of course, you had to take the information off of the quote sheet, put it in the ADS and then from there you can work up a quote and present it to the customer. So that was the information that was in ADS from those quote sheets.

---

[14] Vanyo hired Andrea Miller in July 2006 to enter data into the FSC Database, and she worked for approximately a total of seven days. (Tr. 511.)

(Tr. 469-70.) When asked how Vanyo physically got information from the ADS System into the FSC

Database, Vanyo stated that

> [f]or the prospect information we actually hired a temporary, went to a temporary
> service that we had used over the course of the years in situations. And I had -- there
> was an unused office in the back. And for a period of time, seven days or so, I'm not
> sure what it was, we had this person take that information from the ADS system and
> put it over into the Fiserve or whatever we're calling it today, MI system, whatever.

(Tr. 471.) Additional testimony from Vanyo was as follows:

> Q. And so she retrieved the prospect information directly from the ADS system and
> put it into the FSC database?
>
> A. Yes, she did.
>
> Q. Did you give her any instructions with respect to whether she should be taking
> information regarding active policyholders?
>
> A. I did not. If that was done it was done without my knowledge. I never -- Susan
> is the one that worked closely with Andrea as far as what was to be done.

(Tr. 472.)

According to Vanyo, all information from the quote sheet that he used was entered into the

ADS System. (Tr. 490.) However, Linda Briseno, who worked for Vanyo, would insert information

from ADS into the file folders if such information was missing in a file folder. (Ex. 1252 at 27.)

Briseno would also enter client information into ADS, particularly if clients wanted to change their

policy. (Ex. 1252 at 14-15.) In addition, Susan Vanyo stated that she would also place ADS print-

outs in the clients' hard copy files. (Ex. 1193 at 42.)

According to Jennifer Thompson, a customer service representative for Stone River (the

vendor that provided the FSC Database), Vanyo asked her whether it was possible to import three

Excel spreadsheets into his FSC Database. After a special program was written to do this, Thompson

imported the information contained within spreadsheets into FSC. In performing this import, she

noticed that some of the policyholders had the letter "Z" in front of their names. American Family

53

representatives usually put a "Z" in front of policyholders that were classified as inactive in ADS. (Ex. 1205 at 85-89.)

In sending letters to his soon-to-be former American Family policyholders notifying them of his career change, Vanyo testified that he used the hard files to send the letter to his then-active American Family policyholders, but the information for inactive policyholders and prospects could have been taken from the ADS System. (Tr. 493-94.) However, it is also undisputed that, on October 6, 2006, Vanyo ran at least one ADS query to obtain a checklist so that he could assure that every policyholder identified on that query would receive a letter notifying them of Vanyo's transition from the company. (Tr. 539-41.)

Vanyo also used his account or commission statements for information regarding former American Family policyholders. Such information included policy numbers,[15] effective dates, and premiums. (Tr. 525-27.)

Sometime after his one-year covenant not-to-compete expired, Vanyo called his former American Family customers who had not yet transferred their business to him. Vanyo testified that he obtained such contact information from the FSC Database. (Tr. 544-45.)

A few key pieces of evidence tend to reveal the implausibility of the plaintiffs' assertions that they did not take information from the ADS System. First, deposition testimony from individuals who worked for the plaintiffs' American Family agencies suggests that at least some information was lifted directly from the ADS System, not from the file folders. And second, at least as to Vanyo, Swanigan, and Donnelly, some evidence suggests that the amount of information in their FSC

_____

[15] Vanyo used policy numbers to assist his former American Family policyholders cancel their American Family insurance policies.

Databases exceeded the level of information contained within their file folders. (Tr. 665-66, 677-78, 713-17.)

However, it is immaterial whether the plaintiffs took information from their file folders or from ADS directly. The Seventh Circuit held that, pursuant to a "grantback" clause of a contract, "once agents enter customer information in the database, the information becomes the exclusive property of the plaintiff [company], or at least exclusive as against the agent." *American Family Mutual Ins. Co. v. Roth*, 485 F.3d 930, 932 (7th Cir. 2007). Here, Endorsement 10 contractually obligated the plaintiffs to maintain hard-copy records, which then became property of the Company. Thus, all customer lists and policyholder information, once entered into the ADS System, became the property of American Family. Indeed, the plaintiffs concede this conclusion, stating that if Endorsement 10 is found to be part of the Agent Agreement, then "the right to use customer information was "granted to" American Family under the terms of Endorsement No. 10." (Pls.' Post Tr. Resp. Br. 30.)

Here, it is undisputed that the plaintiffs recorded customer information on their quote sheets, which information went into their file folders, and the plaintiffs subsequently entered that information into ADS. Because I previously found that Endorsement 10 was a part of the plaintiffs' Agent Agreements, it makes no difference whether the plaintiffs took policyholder information from their hard copy files or from ADS because such information from both sources belonged to American Family. In taking American Family's customer lists and policyholder information for the benefit of their new agencies, the plaintiffs misappropriated American Family's trade secrets.[16]

---

[16] It has already been determined that the information in American Family's ADS System was a trade secret. (March 30, 2010 Decision and Order 26.)

55

American Family requests that the court order an injunction prohibiting the plaintiffs from "making any use of the confidential and trade secret information of American Family, requiring them to return to American Family all copies of documents and things, including all electronic copies, containing or embodying the confidential and trade secret information, and requiring them to discontinue any activities aimed at diverting customers away from American Family." (Defs.' Post-Tr. Resp. Br. 84.) Pursuant to Wis. Stat. § 134.90, a court may grant an injunction against a person who violates § 134.90(2). § 134.90(3)(a)1. "The court may continue an injunction for a reasonable period of time to eliminate commercial advantage which the person who violated [§ 134.90(2)] otherwise would derive from the violation." § 134.90(3)(a)3.

First, American Family has not demonstrated that the plaintiffs possess physical documents embodying such trade secret information, and thus, to the extent it claims that the plaintiffs return physical "documents and things," its request will be denied. More importantly, however, American Family has not proven that at this point in time—approximately five years after the agents terminated their American Family Agent Agreements—the plaintiffs continue to derive a commercial advantage from their violation of § 134.90(2). Testimony demonstrated that the plaintiffs used such misappropriated information for one year after their termination from American Family. There is no evidence that they are still using or even deriving a commercial advantage from information about their former American Family policyholders. Maybe the names and addresses of former policyholders who have not yet transferred their business is of use to the plaintiffs still today (even though the evidence does not bear this out). But, how can information about the insured's American Family policy written five years ago result in a competitive advantage to the plaintiffs? Because there has been a failure of proof in demonstrating that the plaintiffs are presently deriving a "commercial advantage" from their misappropriation, no injunction will be issued.

Based on the plaintiffs' misappropriation of its trade secret, American Family requests judgment based on Clifford's testimony of lost profits from out-of-force policies as follows: (1) against Swanigan and the third party defendants in the amount of $334,748.00; (2) against Vanyo and the third party defendants in the amount of $281,406.00; (3) against Jarosch and the third party defendants in the amount of $361,135.00; and (4) against Donnelly and the third party defendants in the amount of $307,998.00. American Family also requests double damages for willful violations of the Trade Secret Act.

The plaintiffs oppose the imposition of such judgment. They argue that pursuant to the election of remedies doctrine, American Family has elected to pursue its contract remedies, thus precluding recovery on its tort claims. Specifically, the plaintiffs state that because American Family elected to assert its contract rights, "the tort claims now asserted by American Family involving the same damage claims cannot be pursued." (Pls.' Post Tr. Resp. Br. 38.)

The doctrine of election of remedies is "'an equitable principle barring one from maintaining inconsistent theories or forms of relief.'" *Wickenhauser v. Lehtinen*, 2007 WI 82, ¶ 16, 302 Wis. 2d 41, 734 N.W.2d 855 (quoting *Head & Seeman, Inc. v. Gregg*, 104 Wis. 2d 156, 159, 311 N.W.2d 667 (Ct. App. 1981)). The election of remedies doctrine requires a injured party to choose a remedy, where the remedies sought are inconsistent with one another. *Id.* A classic example of the doctrine is when a litigant must choose or "elect" between disaffirming the contract through recission or affirming the contract and seeking damages. "[I]nconsistency may arise either because one remedy must allege as fact what the other denies, or because the theory of one must necessarily be repugnant to the other." *Bank of Commerce v. Paine, Webber, Jackson & Curtis*, 39 Wis. 2d 30, 38-39, 158 N.W.2d 350 (1968). In discussing a party's election of two or more inconsistent remedies, the question is whether "the party who had a choice of several rights or remedies elect one and thereby

destroy all right to the others." *Gaugert v. Duve*, 217 Wis. 2d 164, 173, 579 N.W.2d 746 (Ct. App. 1998). In other words, an inconsistency of remedies is "not in reality an inconsistency between the remedies themselves, but must be taken to mean that a certain state of facts relied on as the basis of a certain remedy is inconsistent with, and repugnant to, another certain state of facts relied on as the basis of another remedy." *Bank of Commerce*, 39 Wis. 2d at 38.

Here, the plaintiffs have not demonstrated how American Family has pursued inconsistent remedies. There is nothing inconsistent about the state of facts American Family relies upon in proving its breach of contract claim and its misappropriation claim: the plaintiffs took American Family policyholder information. Additionally, there is nothing inconsistent about what American Family alleges and what it claims as a remedy: lost profits. Thus, to maintain its tort claims, American Family does not rely on a certain state of facts that is inconsistent with the state of facts it relies upon in proving any other remedy. It appears that the plaintiffs rely exclusively on the argument that American Family cannot maintain a breach of contract action and a tort action.

However, in some instances, an injured party may recover on both a breach of contract theory and a tort theory. Take, for example, an insured's claims against an insurance company for breach of contract and for bad faith. In Wisconsin, insureds may maintain both a breach of contract action and a tort action because a bad faith claim "gives rise to damages 'unrelated' to contract damages." *See Jones v. Secura Ins. Co.*, 2002 WI 11, ¶ 33, 249 Wis. 2d 623, 638 N.W.2d 575. Because the breach of an insurance contract and the tort of bad faith are "two separate claims or causes of action," they "appropriately lead to recovery of separate, but not necessarily exclusive, damages." *Id.* ¶ 34.

In *Speciality Coating Systems, Inc. v. Boomer*, No. 1:10-CV-348, 2011 U.S. Dist. LEXIS 64771 (D. Idaho June 17, 2011), a case involving a former employee's alleged breach of a non-compete clause, the court allowed the former employer to maintain a separate tort action against the

58

employee as well. In *Boomer*, the employee signed an "Employee Confidentiality and Non-Solicitation Agreement" wherein the employee agreed that "he would not solicit [former] employees or encourage any customer to terminate or alter its business relationship" with the employer for 18 months and wherein he promised to never disclose the employer's "confidential information." *Id.* at *3-4. Upon learning that its former employee was working for a direct competitor and contacting its customers, the employer sued the employee for breach of contract and for misappropriation of trade secrets. *Id.* at *5-6. The court rejected the employee's argument that "any damages against [him] [were] limited to the liquidated damages provision of the contract." *Id.* at *24 (finding liquidated damages provision applies only to the plaintiff's claim for breach of contract damages and not to the tort claims). Specifically, the court stated that "[i]f the conduct underlying the breach of contract also constitutes a separate tort with a separate and distinct injury, then the liquidated damages cannot be assumed to compensate the injured party for that separate injury." *Id.* at *26-27.

Although the plaintiffs' election of remedies argument is slightly off mark, the plaintiffs' concern with American Family's potential claim for double damages for the same wrong is not unfounded. The plaintiffs, despite couching such concern as an election of remedies issue, take issue with American Family's failure to "allocate damages as between the various tort and contract claims" such that the "damages arising from both claims are identical." (Pls.' Post Tr. Resp. Br. 3-4.) I share the plaintiffs' concerns.

American Family hired Clifford to "[p]repare an estimate of lost profits incurred by American Family attributable to the following alleged harmful acts by" the plaintiffs and third party defendants: "breach of contract; misappropriation of confidential and trade secret information; trademark infringement; violation of federal computer fraud and abuse act; aiding and abetting breach of contract; as well as the lost profits attributable to a third party's interference with the plaintiffs'

contract[s]." (Ex. 1388.)  In rendering one damage calculation, Clifford's calculation encompasses, for example, as to plaintiff Swanigan, lost profits attributable to the totality of Swanigan's conduct as well as the third-parties' conduct.  Because Clifford's damage calculation purportedly includes lost profits, in part, because of the plaintiffs' breach of contract, what portion of those damages is actually caused by the tort violations American Family seeks recovery upon?

"I do not know," is the simple answer.  American Family has made no attempt to demonstrate that the plaintiffs' tort damages are "unrelated" to or are the result of an injury separate from its contract damages.  As the court in *Jones* made clear, "[a] plaintiff should not be allowed to recover damages under a breach of contract theory and then recover the same damages again under a bad faith tort theory" because such would result in a double recovery.  *Jones*, 2002 WI 11, ¶ 23 n.9.  Although this is not a bad faith case, the same can be said in the present case—a double recovery would be had by American Family if it were allowed to recover damages under the breach of contract theory and then recover those same damages under a tort theory.  Because American Family has proffered one lost profits calculation (per plaintiff) based upon the totality of both the plaintiffs' and third parties' conduct, it has failed to show that the separate tort violations resulted in a separate and distinct injury for which it has not been compensated.

Along the same lines, fatal to any claim that American Family is entitled to lost profits above and beyond the liquidated damages is that American Family has failed to prove that any lost profits are causally connected to the plaintiffs' misappropriation.  There is no evidence demonstrating why even one of the plaintiffs' former American Family policyholders (much less a representative sample) cancelled their American Family insurance policies.  In fact, Clifford's damage calculation accounted for profits lost on any policy credited to the plaintiffs' accounts, regardless of whether "it went out of force to [the plaintiffs]," and regardless of whether it went out of force within the one year that the

plainitffs were bound by the non-compete clause. (8/27/10 Tr. 88-89.) Without a shred of evidence demonstrating why their former policyholders cancelled their policies, to say that American Family's lost profits were caused by the plaintiffs' misappropriation would be pure speculation.

Alas, I must return to one final discussion related to the liquidated damages provision of the plaintiffs' Agent Agreements. The plaintiffs' conduct that gave rise to a finding of misappropriation, i.e., the plaintiffs having taken American Family's confidential and trade secret information, is the same conduct that gave rise to a breach of contract claim, specifically, breach of Endorsement 10. Because damages for a breach of contract have already been contemplated by and awarded pursuant to the liquidated damages provisions, any award of damage for injury caused by the same conduct would appear to result in a windfall for American Family.[17] In other words, American Family has not met its burden of proof in establishing that the injury it sustained as a result of the plaintiffs' misappropriation of its trade secrets is different from the injury it sustained as a result of the plaintiffs' breach of contract (Endorsement 10) for which it has already recovered pursuant to the liquidated damages provision set forth in the plaintiffs' respective Agent Agreements. Indeed, this is why the plaintiffs' respective Agent Agreements contained a liquidated damages provision—proving that the plaintiffs' misconduct caused the lost profits alleged is virtually impossible.

---

[17] As previously discussed, American Family did not provide evidence of damages suffered solely because of the plaintiffs' misappropriation of its trade secrets. Damages sustained as a result of the plaintiffs' misappropriation is rolled into its overall calculation of lost profits. And, under the liquidated damage provision, American Family has already recouped at least those lost profits.

61

Put simply, there is insufficient evidence upon which to award tort damages to American Family for the plaintiffs' misappropriation. Therefore, American Family is not entitled to damages for the plaintiffs' tort violations.[18]

### D. Computer Fraud and Abuse Act

American Family maintains a claim against the plaintiffs under the CFAA, 18 U.S.C. § 1030. American Family also claims that the plaintiffs' competitor corporations and CIA aided and abetted the plaintiffs' violation of the CFAA.

The CFAA, while primarily a criminal statute, provides a private right of action:

> Any person who suffers damage or loss by reason of a violation of this section may maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief. A civil action for a violation of this section may be brought only if the conduct involves 1 of the factors set forth in subclauses [subclause] (I), (II), (III), (IV), or (V) of subsection (c)(4)(A)(i).

18 U.S.C. § 1030(g). A person suing under § 1030(g) must prove (1) damage or loss (2) by reason of (3) a violation of § 1030(a), and (4) conduct involving one of the factors set forth in § 1030(c)(4)(A)(i). *See Landmark Credit Union v. Doberstein*, 746 F. Supp. 2d 990, 993 (E.D. Wis. 2010).

American Family contends that the plaintiffs violated § 1030(a)(2) and § 1030(a)(4). Section 1030(a)(2) provides, in pertinent part, as follows:

> Whoever intentionally accesses a computer without authorization or exceeds authorized access, and thereby obtains . . . information from any protected computer if the conduct involved an interstate or foreign communication . . . shall be punished as provided in subsection (c) of this section.

Section 1030(a)(4) provides, in pertinent part, as follows:

---

[18] American Family's claim against the third party defendants for aiding and abetting the plaintiffs' misappropriation suffers from the same defects, and thus, even if it were to prevail on this claim, no recovery could be had by American Family from the third party defendants.

62

Whoever knowingly and with intent to defraud, accesses a protected computer without authorization, or exceeds authorized access, and by means of such conduct furthers the intended fraud and obtains anything of value . . . shall be punished as provided in subsection (c) of this section.[19]

The plaintiffs oppose American Family's claim under the CFAA on three grounds: (1) there is no evidence in the record that the plaintiffs' access was either unauthorized or beyond the scope of access; (2) the expenses American Family claims to have incurred in investigating this claim do not meet the requirements of 18 U.S.C. § 1030(c)(4)(A)(i); and (3) American Family's claims against each of the plaintiffs are separate and distinct and thus the expenses it claims to have incurred should have been allocated according to each plaintiff, rather than being lumped into one sum.

I turn first to the inquiry of whether the plaintiffs accessed a protected computer and if so, whether that access was authorized. Without question, each of the plaintiffs accessed a computer belonging to American Family. First, Vanyo admitted to taking certain information from the ADS System, i.e., information on prospective clients only. As for the remaining three plaintiffs, each ran a number of ADS queries in the months leading up to their termination from American Family. Jarosch ran five ADS queries for business policies on July 24, 2006, which information was transferred to Microsoft Excel on that same day. Swanigan also ran a number of ADS queries from January to February 2006, and although he testified that it may have been for the purpose of sending birthday cards to his policyholders, only one of the three queries appears to be associated with the ages of certain members. Finally, Donnelly ran 28 ADS queries from March to May 2006, and

---

[19]  The Act defines a "protected computer" as one that is "used in or affecting interstate or foreign commerce or communication." 18 U.S.C. § 1030(e)(2)(B). The Act further defines the phrase "exceeds authorized access" as "to access a computer with authorization and to use such access to obtain or alter information in the computer that the accessor is not entitled so to obtain or alter." 18 U.S.C. § 1030(e)(6).

although he testified that the queries could have been related to a district meeting on homeowners' valuations, the queries he ran are not confined to information regarding homeowners' policies.

American Family likens this case to *International Airport Centers, L.L.C. v. Citrin*, 440 F.3d 418 (7th Cir. 2006). In *Citrin*, Citrin was hired by International Airport Centers, LLC ("IAC") to identify properties that IAC may want to acquire and to assist in any ensuing acquisition. Citrin, in breach of his employment contract, decided to quit IAC to go into business for himself. Before returning the laptop IAC loaned to him, he deleted all of the data in it, not by pressing the "delete" key, but by loading a software program designed to write over deleted files and prevent their recovery. *Id.* at 419. The Seventh Circuit held that Citrin's "breach of his duty of loyalty terminated his agency relationship . . . and with it his authority to access the laptop, because the only basis of his authority had been that relationship." *Id.* at 420-21. Because violating the duty of loyalty, or failing to disclose adverse interests, voids the agency relationship, Citrin was without authority to access the laptop. *See id.*

The reasoning of *Citrin* is applicable to this case because, although the plaintiffs were not "employees" of American Family, they entered into a contractual relationship with American Family whereby, as bailee of company property, they were to use such property "for the use and benefit of the Company," (Ex. 1126 § 4.l.), and whereby they agreed not to use or disclose to third parties information contained within the company's software and database (Endorsement 10). The plaintiffs undeniably had authority to access American Family's customer information while acting on behalf of American Family. However, as previously found, the plaintiffs breached their respective duties of loyalty to American Family. Thus, the plaintiffs' breach of their respective duties of loyalty, namely their having taken American Family policyholder information for the benefit of their new insurance agencies, appears to have terminated their authority to access American Family's customer

information. The plaintiffs could not "gain an advantage" by "unilaterally terminating any duties [they] owed" American Family. *See id.* at 420.[20]

Whether American Family has suffered a loss, as defined by the statute, proves to be a more difficult question to answer. To recover on its CFAA claim, American Family must establish that it suffered a "loss" in any one year period of time aggregating at least $5,000 in value. 18 U.S.C. § 1030(c)(4)(A)(i)(I), and § 1030(g). "Loss" is defined as "any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service . . . ." 18 U.S.C. § 1030(e)(11).

American Family offered the testimony of James Madden, the Information Services Strategy and Planning Director at American Family, to provide evidence that it suffered a loss of $25,071.00 "from investigating and preventing the future taking of its customer information . . . ." (Defs.' Post-Tr. Br. 60.) Mr. Madden indicated that American Family's security personnel spent over 240 hours investigating issues related to the plaintiffs' unauthorized access of American Family's computers. The plaintiffs argue that Mr. Madden's "testimony does not establish that the expenses incurred by American Family in 'investigating' this claim, which was undertaken at the request of corporate legal and in furtherance of this litigation, in any way meets the requirements of [] Section 1030 which would establish a claim under the Computer Fraud and Abuse Act." (Pls.' Post Tr. Resp. Br. 40.)

Despite the seemingly vast scope of the definition of "loss," many courts have held that to state a claim based on loss, the loss must relate to the impairment or unavailability of data on a

---

[20] Because I find that American Family has satisfied the elements of proving a violation of 18 U.S.C. § 1030(a)(2), I need not examine whether the plaintiffs also violated 18 U.S.C. § 1030(a)(4).

computer. *See Del Monte Fresh Produce, N.A., Inc. v. Chiquita Brands Int'l, Inc.*, 616 F. Supp. 2d 805, 811-13 (N.D. Ill. 2009) (holding that the cost an employer incurred in conducting a damage assessment did not constitute a "loss" under the CFAA and dismissing employer's CFAA claim based upon the former employee having e-mailed business data to a third party); *Cassetica Software, Inc. v. Computer Sciences Corp.*, No. 09 C 0003, 2009 U.S. Dist. LEXIS 51589, at *11 (N.D. Ill. June 18, 2009) (stating that the "alleged loss must relate to the investigation or repair of a computer system following a violation that caused impairment or unavailability of data"); *Kluber Skahan & Assoc., Inc. v. Cordogan, Clark & Assoc., Inc.*, No. 08-cv-1529, 2009 U.S. Dist. LEXIS 14527, at *28 (N.D. Ill. Feb. 25, 2009) (stating that "[l]osses are monetary harms attenuated from the underlying concern of the Act: damage to data").

To be sure, other courts have interpreted "loss" to include the cost of responding to a security breach. *See NCMIC Fin. Corp. v. Artino*, 638 F. Supp. 2d 1042, 1063-64 (S.D. Iowa 2009) (awarding damages for the cost of the employer's remedial action and investigation of the employee's unauthorized access of its computer); *I.M.S. Inquiry Mgmt. Sys., Ltd. v. Berkshire Info. Sys.*, 307 F. Supp. 2d 521, 525-26 (S.D.N.Y. 2004) (holding that "loss" includes the "damage assessment and remedial measures")). Such responses to a CFAA violation have also been interpreted to include the costs incurred in investigating the offense. *See Artino*, 638 F. Supp. 2d at 1064 (citing *SuccessFactors, Inc. v. Softscape, Inc.*, 544 F. Supp. 2d 975, 980-81 (N.D. Cal. 2008).

In light of the spirit and purpose of the CFAA, I am more persuaded by the first line of authority, which is to say that costs that are not related to the impairment or damage to a computer or computer system are not cognizable losses under the CFAA. As one court noted, the underlying concern of the Act is damage to data, and the "statute was not meant to cover the disloyal employee who walks off with confidential information. Rather the statutory purpose is to punish trespassers

and hackers." *Kluber Skahan & Assocs.*, No. 08-cv-1529, 2009 U.S. Dist. LEXIS 14527, at *28 (quoting *Am. Family Mut. Ins. Co. v. Rickman*, 554 F. Supp. 2d 766, 771 (N.D. Ohio 2008)).  This sentiment was echoed in *Del Monte Fresh Produce*: "[t]he CFAA should not be used to prosecute employees who are merely disloyal," 616 F. Supp. 2d at 813, and in *Landmark Credit Union v. Doberstein*, 746 F. Supp. 2d 990, 994 (E.D. Wis. 2010): "[t]here is virtually no support for the proposition that merely accessing and disseminating information from a protected computer suffices to create a cause of action under the CFAA."  *See also Citrin*, 440 F.3d at 420 (stating that in enacting the CFAA, Congress was concerned about "attacks by virus and worm writers, on the one hand, which come mainly from the outside, and attacks by disgruntled programmers who decide to trash the employer's data system on the way out . . . , on the other.")

Because American Family has not proven that it has suffered a loss cognizable under the CFAA, its CFAA claim must fail.  Because it cannot prevail on its CFAA claim against the plaintiffs, it logically follows that the third party defendants are not liable for aiding and abetting the plaintiffs' CFAA violations (assuming such a theory of liability is available to American Family).

### IV. CONCLUSION

Without question, this was a hard-fought case.  It has been more than four years since the filing of the complaint, during which time lengthy discovery was undertaken, dispositive motions were filed and decided, trial was conducted, trial testimony was re-opened and supplemented, and post-trial briefing spanned numerous months and pages.  Resolution for the parties has been a long time coming.  But, that time is now at hand.

For the reasons set forth above, I find that the plaintiffs breached their respective Agent Agreements with American Family.  Because the liquidated damages provision contained therein is reasonable and enforceable, the plaintiffs will be ordered to return to American Family those

Case 2:07-cv-00212-WEC   Filed 09/16/11   Page 67 of 69   Document 202

extended earnings that were erroneously paid to them before American Family learned about the plaintiffs' post-termination conduct. Moreover, the plaintiffs' claim for the remaining extended earnings as well as for life insurance commissions fails.

Although the plaintiffs misappropriated American Family's trade secrets, there is no evidence upon which to award American Family damages for this limited violation. American Family has not shown that it suffered injury and damages separate from the injury suffered as a result the plaintiffs' breach of Endorsement 10 and the damages already recovered for such breach under the liquidated damages provision.

As to the third party defendants, American Family has failed to prove its claims for aiding and abetting breach of contract, for tortious interference with contract, and for aiding and abetting the plaintiffs' misappropriation of trade secrets.

Finally, American Family has failed to show that it suffered loss as defined by the CFAA, and is therefore not entitled to recover on its CFAA claim against either the plaintiffs or third party defendants.

**NOW THEREFORE IT IS ORDERED** that American Family shall take $14,203.36 from Donnelly; $8,563.38 from Vanyo; $48,242.40 from Swanigan; and $6,025.83 from Jarosch, because extended earnings in that amount were erroneously paid to those parties before the discovery of their breach of contract;

**IT IS FURTHER ORDERED** that the plaintiffs, Jarosch, Swanigan, Donnelly, and Vanyo, shall taking nothing from the defendants on their breach of contract claim;

**IT IS FURTHER ORDERED** that American Family shall take nothing from the plaintiffs on its misappropriation and Computer Fraud and Abuse Act claims;

IT IS FURTHER ORDERED that American Family shall take nothing from Jarosch Insurance Agency, Inc., Vanyo Insurance Group, Inc., Donnelly Insurance Group, Inc., Gary Swanigan Insurance Agency, Inc., Couri Insurance Associates, LLC, and Couri Insurance Associates West, LLC on its claim for aiding and abetting the plaintiffs' breach of contract, its claim for tortious interference with contract, its claim for aiding and abetting the plaintiffs' misappropriation of trade secrets, and its claim for aiding and abetting the plaintiffs' breach of the Computer Fraud and Abuse Act;

IT IS FURTHER ORDERED that this action be and hereby is DISMISSED;

IT IS FURTHER ORDERED that the Clerk of Court enter judgment accordingly.

SO ORDERED this 16th day of September 2011 at Milwaukee, Wisconsin.

BY THE COURT:

s/ William E. Callahan, Jr.
WILLIAM E. CALLAHAN, JR.
United States Magistrate Judge